| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>BRADLEY L. RUDERMAN | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br><br>09-    09 1011 M |

FILED
CLERK, U.S. DISTRICT COURT

MAY 14 2009

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| Complaint for violation of Title 18, United States Code, Section 1343 | |
|---|---|

| NAME OF MAGISTRATE JUDGE<br><br>HONORABLE PATRICK J. WALSH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|
| 2002 - April 15, 2009 | Los Angeles County | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning in or about 2002 and continuing until on or about April 15, 2009, within the Central District of California and elsewhere, defendant BRADLEY L. RUDERMAN knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud investors as to a material matter, and to obtain money from such investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts. In furtherance of the scheme, on or about January 20, 2009, defendant RUDERMAN caused $500,000 to be wired from Goldman Sachs Execution & Clearing, LP's account #75VY, through the Federal Reserve Bank of New York processing office in New Jersey, to Ruderman Capital Partners, LLC's City National Bank account (#112062882) in Los Angeles, California. Also in furtherance of the scheme, on January 23, 2009, defendant RUDERMAN caused $300,000 to be wired from Goldman Sachs Execution & Clearing, LP's account #75VY, through the Federal Reserve Bank of New York processing office in New Jersey, to Ruderman Capital Partners, LLC's City National Bank account (#112062882) in Los Angeles, California.

BASIS OF COMPLAINT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT |
|---|---|
| | OFFICIAL TITLE<br><br>JEREMY TARWATER, Special Agent (FBI) |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br><br>May 14, 2009 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA: COM                       REC: DETENTION (Warrant)

## A F F I D A V I T

I, JEREMY R. TARWATER, being duly sworn, hereby state as follows:

### I

### INTRODUCTION

1.  I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been so employed since March 2008.  I am currently assigned to the Los Angeles Division of the FBI.  I specialize in the investigation of white collar crime, including but not limited to securities fraud, mail fraud and wire fraud, in violation of Title 15, United States Code, Sections 77 and 78; and Title 18, United States Code, Sections 1341 and 1343.

2.  I received formal training at the FBI Academy at Quantico, Virginia, in 2007-2008.  My training included but was not limited to the investigation of various types of financial crimes, including mail fraud, wire fraud, and investment fraud. Prior to becoming a Special Agent of the FBI, I obtained a juris doctor degree from Georgetown University Law Center (2001) and was an associate specializing in corporate securities law with the law firms of Latham & Watkins LLP, and Farella Braun + Martel LLP.

3.  Since April 2009, I have been assigned to the investigation of securities fraud, mail fraud, wire fraud, and

other crimes committed during the period of approximately 2002
through approximately April 15, 2009 by BRADLEY L. RUDERMAN
("RUDERMAN").

4.   During the course of the investigation, I have
interviewed percipient witnesses, including victim-investors;
reviewed documents voluntarily provided by those witnesses,
including investment offering materials, Schedule K-1 statements,
quarterly and annual reports, capital account and profit and loss
statements, and "Portfolio Analysis" monthly statements provided
to investors; obtained and reviewed bank records, brokerage
records, and other records related to RUDERMAN, RCM and the FUNDS
(as such terms are defined below); and been briefed by other
Special Agents of the FBI and enforcement attorneys employed by
the United States Securities & Exchange Commission ("SEC").  In
addition, on April 30, 2009, RUDERMAN, accompanied by his
counsel, voluntarily met with me and attorneys from the United
States Attorney's Office, Central District of California, and
voluntarily provided information to the government.  The
government made no representations, promises, or agreements
regarding the use by the government of the statements RUDERMAN
provided during the interview.

5.   Except where indicated that stated facts are based on
information and belief, I have personal knowledge of the facts
stated herein and, if called as a witness, could and would

testify competently thereto.  This statement of facts is not meant to be a complete recitation of all facts relevant to the criminal conduct described herein, or of all facts known to me that relate to that conduct.

## II

### CRIMINAL COMPLAINT

6.  This affidavit is made in support of a criminal complaint against and an arrest warrant for BRADLEY L. RUDERMAN ("RUDERMAN").  Based on the information set forth in this affidavit, there is probable cause to believe that, beginning on a date unknown and continuing until at least April 15, 2009, within the Central District of California and elsewhere, RUDERMAN engaged in a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and used interstate wires in furtherance of the scheme, in violation of Title 18, United States Code, Section 1343.

## III

### PROBABLE CAUSE

A.  **OVERVIEW**

7.  Based on my investigation, I have determined the following:

a.  Since approximately 2002, RUDERMAN has operated a fraudulent scheme through his limited liability company RUDERMAN CAPITAL MANAGEMENT, LLC ("RCM") and his hedge funds RUDERMAN

3

CAPITAL PARTNERS, LLC ("RCP") and RUDERMAN CAPITAL PARTNERS A, LLC ("RCPA").

b.  To obtain investments in RCP and RCPA (together, the "FUNDS"), RUDERMAN provided false and misleading statements to victim-investors and potential victim-investors stating that the FUNDS earned consistent yearly gains of between 15% and 61%. RUDERMAN additionally provided false and misleading statements regarding the FUNDS' assets under management, and the securities purportedly held in the portfolios of the FUNDS.

c.  Between 2002 and 2009, approximately 22 victim-investors invested at least $44.3 million with RUDERMAN and RCM through the FUNDS.

d.  In fact, RUDERMAN did not invest the victim-investors' money as he represented he had, and the victim-investors did not receive the returns that RUDERMAN had promised.

e.  On at least one occasion, namely in January 2009, RUDERMAN used money invested in RCP by new victim-investors to pay purported interest payments ("Ponzi payments") to an earlier RCP investor.

f.  During the period that RUDERMAN was soliciting investments in the FUNDS, he used monies entrusted to him by victim-investors to pay for extravagant personal expenses.

g.  On or about April 15, 2009, RUDERMAN caused a letter to be sent to the victim-investors stating that "there is

4

currently very little value in the assets held by [RCP]." Although some victim-investors had recovered some of the money they had invested, for the most part, they lost the money they had entrusted to RUDERMAN, RCM and the FUNDS.

**B.    THE SCHEME TO DEFRAUD**

[1] Background Information

8.    I have reviewed California Department of Motor Vehicles records and other public records, from which I learned that RUDERMAN was born in 1963 and is a resident of Beverly Hills, California.

9.    Based on a review of public records, documents provided to me by investors, and information provided to me by the SEC, I know the following:

a.    RCM has been a registered California limited liability company since May 1, 2000, and is based in Beverly Hills, California.  In offering materials distributed to investors, RUDERMAN described RCM as the "Manager" of RCP and RCPA.

b.    RCP has been a registered California limited liability company since February 20, 2003, and is based in Beverly Hills, California.  The SEC informed me that RCP and its securities are not registered with the SEC.

c.    RCPA has been a registered California limited liability company since January 24, 2005, and is based in Beverly

Hills, California.  The SEC informed me that RCPA and its securities are not registered with the SEC.

10.  At the April 30, 2009 interview, RUDERMAN stated the following:

a.    RUDERMAN formed and controlled RCM;

b.    RCP is a hedge fund that RUDERMAN formed, managed and controlled; and

c.    RCPA is a hedge fund that RUDERMAN formed, managed and controlled.

[2]  **The Scheme to Defraud**

11.  Based on my interviews of victim-investors and my review of the documents they provided to me, including offering materials for investments in the FUNDS (see Section III.B.3, below), I know that between 2002 and 2009, RUDERMAN offered investors equity interests in at least two hedge funds that he managed: RCP and RCPA.  Upon their investing and execution of subscription agreements, RUDERMAN provided investors with certificates representing their interests in the FUNDS.  The minimum investment required by RUDERMAN was $500,000.  Between 2002 and 2009, approximately 22 victim-investors invested at least $44.3 million with RUDERMAN and RCM through the FUNDS.

12.  RUDERMAN told investors that he would invest in a diversified selection of equities through what he called a "long-short strategy."  The offering materials for RCP described the

6

investment objectives as follows:

> The Fund seeks above average capital appreciation,
> utilizing a multi-strategy, opportunistic investment
> approach.  It employs various, specific predetermined
> strategies in an effort to diversify approach, e.g.
> using value and aggressive growth, special situations
> and short selling.

> The Fund invests primarily in equity securities of U.S.
> and foreign companies.

13.  Based on my interviews of victim-investors L.N. and A.A. (see ¶¶ 22 & 23, below), I know that RUDERMAN successfully solicited investments in the FUNDS as recently as January 2009.

14.  During my interview of victim-investor L.N. (see ¶ 22, below), L.N. told me that he had invested money with RUDERMAN and that, as recently as late March or early April 2009, RUDERMAN had asked him for the names of potential new investors.  Thus as recently as late March or early April, 2009, RUDERMAN was continuing to solicit new victim-investors by asking current victim-investors for the names of potential additional investors.

15.  I have reviewed records of RCM, RCP and RCPA's prime brokerage accounts and City National Bank accounts.  Based on my review of these records, I know that RUDERMAN was the signatory on these accounts.

16.  At the April 30, 2009 interview, RUDERMAN stated that between at least 2002 and 2008, RUDERMAN issued false quarterly account statements to investors in the FUNDS.  In addition, RUDERMAN stated that he issued account statements that falsely

stated the FUNDS' investment returns and total assets. RUDERMAN further stated that the list of securities held by RCP in the various statements sent out to investors was almost entirely false.

17. Based on my own review of the account statements provided to investors in the FUNDS, I know that RUDERMAN distributed account statements containing false information.

a. For example, a January 2009 statement sent by RUDERMAN to investors reported that in 2008, RCP had earned approximately 15%. In this January 2009 statement (the "January 2009 Statement"), RUDERMAN included the following table of RCP's investment returns:

| Year | Percentage Gain |
|------|-----------------|
| 2002 | 54.99% |
| 2003 | 60.56% |
| 2004 | 32.17% |
| 2005 | 23.30% |
| 2006 | 22.02% |
| 2007 | 19.09% |
| 2008 | 14.99% |

The January 2009 Statement also reported that, as of January 31, 2009, RCP had funds under management of $206 million.

b. Based on a review of RCP's brokerage account records, I know that the January 2009 Statement contained false statements. The brokerage records show that RCP lost over $3 million in 2008, and ended the year with a net value of $588,246. These brokerage records further show that RCP did not in fact

8

have $206 million of funds under management on January 31, 2009.

18. In January 2009, RUDERMAN used new investor funds to pay earlier investors. In an interview, R.R. told me that in approximately November 2008, he contacted RUDERMAN and requested a January 2009 withdrawal of $750,000 of the funds that he had invested in RCP. Based on my review of bank and brokerage records, I know that RCP did not have sufficient funds to pay this amount. Only after RCP received $1 million in deposits from new investors on January 15, 2009 ($500,000 from B.O. LLC and E.O. LLC (defined below)) and on January 22, 2009 ($500,000 from the A. A. Trust (defined below)), was RUDERMAN able to transfer funds out of RCP's account to pay the earlier investor, R.R. RUDERMAN caused $750,000 of these new investor funds to be transferred to R.R. on or about January 21, 2009 ($500,000) and January 23, 2009 ($250,000). (See ¶¶ 26f & 26g, below).

19. On or about April 15, 2009, RUDERMAN's attorney, William Floratos, sent victim-investors a letter (the "Floratos Letter") stating that "there is currently very little value in the assets held by the [FUNDS]." Victim-investors began demanding the return of their investments, and RUDERMAN's fraudulent scheme collapsed.

[3] **Victim Statements**

20. On April 21, 2009, I spoke with J.K., who told me the following:

a.  J.K. and RUDERMAN are cousins.  J.K.'s parents, R.K. and N.K., began investing with RUDERMAN as early as 2003 when RUDERMAN first started RCP.  J.K. initially invested along with his parents in RCP, then later held his own investments with RCP. R.K. and N.K. also invested in RCPA.  Other relatives of J.K. also invested with RUDERMAN, including A.K. and A.B.

b.  RUDERMAN consistently reported that the investments made by J.K. and his family were achieving high returns. RUDERMAN sent J.K. monthly one-page performance updates via e-mail as well as quarterly financial statements via Federal Express.  RUDERMAN also provided to J.K. yearly Schedule K-1 (Form 1065) statements ("K-1 statements") for tax purposes.  All of these statements reported high returns at RCP.

c.  Based on these performance numbers, J.K. invested additional monies with RCP, including an additional $100,000 on or about July 1, 2006.  He was told by RUDERMAN that his total investment was worth $650,000 at this point.

d.  On or about April 15, 2009, J.K. received the Floratos Letter.  This letter, which was addressed to all members of RCP, stated that RCP had very few assets remaining.  This was the first time that J.K. had any indication from RUDERMAN that RCP was not performing well.

e.  J.K. provided to me numerous documents that he had received from RUDERMAN pertaining to his investments in RCP,

10

including offering materials for RCP and financial and performance statements created by RUDERMAN. J.K. further provided to me a list of investors he understood had invested with RUDERMAN, including many family members of RUDERMAN and J.K.

     f.   J.K. never received any money from RUDERMAN, RCM or the FUNDS.

    21.   On April 17, 2009, I spoke with Thomas Waldman, counsel for victim P.C. Corp. ("PCC"), who told me the following:

     a.   PCC invested a total of $4 million with RUDERMAN and his hedge fund RCP beginning in 2006. RUDERMAN provided PCC with regular statements regarding their investment. RUDERMAN managed RCP and put together the financial statements for RCP.

     b.   In late 2008, PCC attempted a full redemption of their interests in RCP. By this point, RUDERMAN's statements indicated that the PCC investment was worth $6.8 million. In response, RUDERMAN provided numerous excuses and delays and appealed to PCC not to withdraw from RCP. Eventually, RUDERMAN agreed to allow PCC to redeem its interests in RCP. RUDERMAN promised to wire PCC its money on April 15, 2009.

     c.   Instead, on April 15, 2009, Waldman, on behalf of PCC, received the Floratos Letter.

     d.   Neither Waldman nor PCC received any money from RUDERMAN, RCM or the FUNDS.

     e.   Waldman provided to me numerous documents that he

had received from RUDERMAN pertaining to PCC's investments in RCP. Included among these documents were the financial and performance statements created and distributed by RUDERMAN, as well as RCP offering materials.

22. On April 27, 2009, I spoke with L.N., who told me the following:

a. L.N.'s family trust controls the entities B.O. LLC and E.O. LLC.

b. B.O. LLC and E.O. LLC invested $250,000 each with RCP on or about January 15, 2009. B.O. LLC and E.O. LLC each wired $250,000 to RUDERMAN pursuant to RUDERMAN's instructions.

c. L.N. invested with RCP after RUDERMAN spent approximately six months trying to persuade L.N. to invest.

d. As recently as late March or early April 2009, RUDERMAN asked L.N. if he knew of anyone who might be interested in investing in the FUNDS.

e. Neither L.N., B.O. LLC, nor E.O. LLC received any money from RUDERMAN, RCM or the FUNDS.

23. On April 28, 2009, I spoke with A.A., who told me the following:

a. RUDERMAN attempted to solicit A.A. to invest in the FUNDS for a long period of time. On or about January 22, 2009, A.A. and RUDERMAN met for lunch to discuss a possible investment by A.A. in RCP. At this lunch, RUDERMAN showed A.A. various

12

documents purporting to illustrate RCP's excellent past performance in the stock markets. RUDERMAN further stated that it was a good time to invest in the markets due to the recent market decline. Lastly, RUDERMAN promised A.A. a monthly rate of return and a 50% profit split.

b. Based on RUDERMAN's representations, A.A. agreed to invest $500,000 through his trust (the "A.A. Trust"). On or about January 22, 2009, the A.A. Trust wired $500,000 to RCP pursuant to the wiring instructions provided by RUDERMAN.

c. After his investment, A.A. began receiving via e-mail updates from RUDERMAN providing performance figures for RCP.

d. In April 2009, A.A. received the Floratos Letter. Neither A.A. nor the A.A. Trust received any money from RUDERMAN, RCM or the FUNDS.

24. On May 12, 2009, I spoke with R.R., who told me the following:

a. R.R. invested with RUDERMAN's fund RCP beginning in 2003 through two entities: R.R. Diversified L.P. ("Diversified") and the R.R. IRA (the "R.R. IRA"). From 2003 to 2008, R.R. invested approximately $9.2 million with RCP. Throughout this period of time, RUDERMAN sent quarterly reports on the performance of RCP to R.R. via Federal Express. RUDERMAN also sent monthly performance statements for RCP to R.R. via e-mail.

b. In approximately November 2008, R.R. contacted

RUDERMAN and requested a withdrawal of $750,000 of the funds that he had invested with RCP.

c.  On or around January 21, 2009, RCP wired $500,000 to R.R.'s Charles Schwab account held in the name of R.R.'s family trust (the "R.R. Family Trust").

d.  On or around January 23, 2009, RCP wired an additional $250,000 to R.R.'s Charles Schwab account held in the name of the R.R. Family Trust.

[4]  **Misrepresentations**

25.  In the course of my investigation, I have learned that RUDERMAN created false and misleading financial and performance statements, as follows:

a.  During the April 30, 2009 interview, RUDERMAN told me that he provided various false financial and performance statements regarding the FUNDS to investors.  According to the statements of J.K. and R.R. (see Section III.B.3, above), these financial and performance statements were sent to investors via both e-mail and Federal Express.

b.  For example, RUDERMAN provided to investors a "RUDERMAN CAPITAL PARTNERS, LLC ANNUAL REPORT OF FINANCIAL CONDITION" dated December 31, 2007 (the "2007 Annual Report"). RUDERMAN told me that the 2007 Annual Report falsely represented that certain stocks were held in the RCP portfolio.  Attached to the end of the 2007 Annual Report was a "Report of Independent

14

Auditors" purportedly executed by accounting firm Rothstein Kass ("RKCO LLP"). In fact, RUDERMAN informed me that he never engaged RKCO LLP and that he created the auditor report himself to create the appearance to investors that RCP's financial status had been independently audited and verified. RUDERMAN further told me that statements sent to investors, including the 2007 Annual Report, provided false RCP performance numbers and false RCP assets under management figures. Attorneys for the SEC told me that they had confirmed that RKCO LLP was never engaged by RUDERMAN or the FUNDS.

c. According to the statements of J.K., A.A., and R.R. (see above), RUDERMAN e-mailed investors, on a monthly basis, a one-page "Portfolio Analysis Report" providing the performance figures for RCP. According to these reports, RCP reported performance figures for the period of 2002 to 2008 of between 14.99% and 60.56%. These reports additionally reported that, as of January 31, 2009, RCP had $206 million in funds under management. RUDERMAN told me that these reports were false. He stated that they misrepresented the performance of RCP, the assets under management for RCP, and the portfolio holdings of RCP.

d. RUDERMAN told me that he also provided false statements of income and loss, false K-1 statements, and false capital account statements to investors. RUDERMAN told me that

15

he drafted these statements himself without any assistance.

**[5]**    **Bank Records**

26.    I have reviewed records of the bank and brokerage accounts controlled by RUDERMAN, including those held at City National Bank ("CNB"), Goldman Sachs Execution & Clearing, L.P. ("GSEC"), and Witenberg Investment Companies, Inc. ("WIC"). Based on my review, and on my training and experience, I know the following:

a.    GSEC is a United States broker-dealer that provides clearing, settlement and back office services to other registered broker-dealers, often referred to as "introducing brokers". Introducing brokers, such as WIC, introduce their clients to GSEC.    From approximately 2003 to 2009, WIC acted as an introducing broker for RCP and RCPA, and consequently GSEC provided clearing, settlement and back office services to RCP and RCPA.    As a result, GSEC/WIC held prime brokerage accounts for RCP and RCPA.    According to GSEC/WIC documents and RUDERMAN's statements, RUDERMAN controlled the RCP and RCPA prime brokerage accounts held at GSEC/WIC.

b.    RUDERMAN authorized significant transfers of money from the FUNDS' GSEC/WIC brokerage accounts to CNB accounts held in the name of the FUNDS.    He then caused significant transfers of money from the FUNDS' CNB bank accounts to his own personal bank account at CNB.

c.    For example, from August 2006 to March 2009, RUDERMAN transferred approximately $2.5 million from the RCPA CNB account to his personal CNB account.    From December 2005 to March 2009, he transferred approximately $3.6 million from the RCP CNB account to his personal CNB account.    Once these funds were transferred into his personal bank account, RUDERMAN spent a majority of the funds on personal expenses, including ATM cash withdrawals, American Express and Citi Card credit card payments, and personal checks (many of which RUDERMAN told me were payments to cover gambling losses).    By March 2009, RUDERMAN's personal CNB account balance was zero.    Similarly, the CNB accounts for RCPA, RCM and RCP had been depleted to zero by the end of March 2009.

d.    My review of the bank and brokerage account records confirmed that on January 15, 2009, B.O. LLC and E.O. LLC each wired $250,000, for a total of $500,000, to GSEC/WIC for credit to RCP.    On January 20, 2009, RUDERMAN instructed GSEC to wire the $500,000 to RCP's account at CNB.    The records further confirmed that on January 20, 2009, this $500,000 was credited to RCP's CNB account.    These records thus corroborated L.N.'s April 27, 2009 statements to me regarding his investment with RCP.    (See ¶ 22, above).

e.    My review of the bank and brokerage account records confirmed that on January 22, 2009, the A.A. Trust wired $500,000

17

to GSEC/WIC for credit to RCP.  On January 23, 2009, RUDERMAN instructed GSEC to wire $300,000 of that $500,000 to RCP's account at CNB.  The records further confirmed that on January 23, 2009, this $300,000 was credited to RCP's CNB account.  These records thus corroborated A.A.'s April 28, 2009 statements to me regarding his investment with RCP.  (See ¶ 23, above).

     f.  My review of the bank and brokerage account records confirmed that on January 21, 2009 and January 23, 2009, RCP wired $500,000 and $250,000, respectively, from its CNB account to a prior RCP investor, R.R..  (See ¶ 18, above).  These records further showed that RUDERMAN caused the incoming money from B.O. LLC, E.O. LLC, and A.A. Trust investments was distributed back out within a day of being deposited into the CNB account of RCP.

     g.  My review of the bank and brokerage account records further confirmed that without the B.O. LLC and E.O. LLC investments made on January 15, 2009, and the A.A. Trust investments made on January 22, 2009, the RCP account at CNB did not contain sufficient funds to distribute $750,000 to the prior RCP investor.  The RCP account at CNB had approximately $175,786 as of December 31, 2008, and the other accounts controlled by RUDERMAN at CNB (his personal account, the RCPA account, and the RCM account) held collectively less than $25,000 as of the end of December 2008.

//

[6] **RUDERMAN'S Statement**

27.  On April 30, 2009, RUDERMAN, accompanied by his attorney, voluntarily came to the Los Angeles office of the United States Attorney's Office to be interviewed about the above-described scheme to defraud.  The government made no representations, promises, or agreements about the use of Ruderman's statements.  During the interview, RUDERMAN made the following statements:

a.  In 2000, he formed RCM to manage his own money and that of family members, including the J.K. family (his cousins) and his uncle A.B.  He controlled RCM.

b.  In 2003, he formed the hedge fund RCP to take in non-family investors.  He controlled RCP.

c.  In 2006, he formed the hedge fund RCPA to make ERISA investments.  He controlled RCPA.

d.  While RUDERMAN did in fact invest some of the money invested in the FUNDS, he misrepresented the performance of the FUNDS from their inception up to March 2009.  For example, in 2008, while falsely representing that RCP had posted a 14.99% gain, RCP actually lost approximately $3 million.  The FUNDS never performed as well as RUDERMAN stated, posting minimal positive gains in three of ten years of operation and losses in the remaining seven years.

19

e.  RUDERMAN himself created all the statements and performance updates which were distributed to investors. Specifically, he created false K-1 statements, false quarterly and annual reports, false capital account and profit and loss statements, a false auditor's letter, and false "Portfolio Analysis" monthly statements.  RUDERMAN also falsely represented the securities held by the FUNDS, stating that there was "no" or "very little correlation" between the actual holdings in the FUNDS and the listed holdings.

f.  From 2002 to 2009, RUDERMAN solicited a total of approximately $44.3 million from investors.

g.  During that same time period, RUDERMAN spent approximately $8.7 million of investor money on personal expenses, including rent for his residence and vacation home, expensive automobiles, a personal assistant, and attendance at sports events.  RUDERMAN stated that approximately $5.2 million of this $8.7 million figure was attributable to gambling losses, including losses at a clandestine high-stakes poker game held on a regular basis in a suite at a luxury Beverly Hills hotel.

h.  In addition, between 2003 and 2009, RUDERMAN diverted approximately $6.5 million out of the FUNDS to pay investors in separate ventures that had also lost significant amounts of money.

i.  RUDERMAN estimated that from 2003 to 2009, he had

lost $10 million of FUNDS money trading in the stock markets. These losses significantly exceeded any gains ever recorded by the FUNDS.

        j.  The majority of investments were made to RCP or RCPA via wire transfers into accounts held and/or controlled by RUDERMAN at CNB.  Money was then transferred by RUDERMAN into his personal CNB account and then either spent on personal expenses or distributed to persons who were not investors in RCP or RCPA.

    **[7]**   **Loss**

    28.  I am aware of approximately 22 victim-investors.  I have not personally spoken with every victim, but I know of them through interviews and documents I have received from victims and from the SEC.  RUDERMAN's verbal and written statements to me have confirmed that there are approximately 22 victim-investors. The total loss, according to these interviews and documents, is approximately $44.3 million.  RUDERMAN's verbal and written statements to me confirmed this approximate total loss amount.

    **[8]**   **Use of interstate wires**

    29.  Based on my review of bank records from CNB, my review of wires processed through the Federal Reserve Bank of New York, and my interview with L.N., I know that on January 15, 2009, two wires for $250,000 each were wired from Wachovia Bank NA in Virginia, through the Federal Reserve Bank of New York processing office in New Jersey, to GSEC's bank account in New York at

JPMChase for credit to RCP. On January 20, 2009, RUDERMAN instructed GSEC to wire the $500,000 to RCP's account at CNB in Los Angeles. The records further confirmed that on January 20, 2009, this $500,000 was wired from GSEC account #75VY, through the Federal Reserve Bank of New York processing office in New Jersey, to RCP's CNB account (#112062882) in Los Angeles, California. These funds were wired in furtherance of the above-described scheme to defraud in that they were investments made by L.N. in RCP based upon RUDERMAN's misrepresentations and false statements.

30. Based on my review of bank records from CNB, my review of wires processed through the Federal Reserve Bank of New York, and my interview with A.A., I know that on January 22, 2009, $500,000 was wired from CNB in Los Angeles, through the Federal Reserve Bank of New York processing office in New Jersey, to GSEC's bank account in New York at JPMChase for credit to RCP. On January 23, 2009, RUDERMAN instructed GSEC to wire $300,000 of that $500,000 to RCP's account at CNB in Los Angeles. The records further confirmed that on January 23, 2009, this $300,000 was wired from GSEC account #75VY, through the Federal Reserve Bank of New York processing office in New Jersey, to RCP's CNB account (#112062882) in Los Angeles, California. These funds were wired in furtherance of the above-described scheme to defraud in that they were investments made by A.A. in RCP based

22

upon RUDERMAN's misrepresentations and false statements.

IV

### CONCLUSION

31.  Based upon the facts set forth above, there is probable cause to believe that on January 20, 2009 and January 23, 2009, BRADLEY L. RUDERMAN committed Wire Fraud, in violation of Title 18, United States Code, Section 1343.

Jeremy R. Tarwater
Special Agent, FBI

Sworn and subscribed to
before me on this 14th day
of _____May_____, 2009.

UNITED STATES MAGISTRATE JUDGE

23