1  JAMES D. RIDDET, ESQ.  (SBN 39826)
   STOKKE & RIDDET
2  3 MacARTHUR PLACE, SUITE 750
3  SANTA ANA, CA  92707
   TELEPHONE: 714/662-2400
4  FACSIMILE: 714/662-2444
   E MAIL: Jriddet@stokkeriddet.com
5
6  Attorneys for Defendant

7

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

11

12  UNITED STATES OF AMERICA,     )     Case No. CR 09-0757 SVW
                                  )
13            Plaintiff,          )
                                  )
14       vs.                      )
                                  )
15  BRADLEY LEWIS RUDERMAN,       )
16                                )
17            Defendant.          )
                                  )
18  _____ )

19

20      POSITION OF DEFENDANT BRADLEY LEWIS RUDERMAN
21        ON SENTENCING FACTORS AND SENTENCING BRIEF

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2 Table of Contents.......................................................................... ii

3 Table of Authorities...................................................................... iv

4 Notice of Under Seal Filing............................................................ 1
  I.   Introduction...................................................................... 1
5 II.  Relevant Facts ................................................................... 3
6      A. Defendant's Background.................................................. 3
7      B. Voluntarily Coming to the Government............................. 4
       C. Facts Related to Loss..................................................... 7
8      D. Facts Relating to Defendant's Gambling Addiction.............. 10
9      E. Beit T'Shuvah .............................................................. 12
10     F. Assistance in Retrieving Funds to Pay Investors ............... 18
   III.  Objections to PSR ............................................................. 19
11 IV.  Reference Letters.............................................................. 24
12 Memorandum of Law in Support of Defendant's Sentencing Position........ 27
       I.   Sentencing Position..................................................... 27
13     II.  Guidelines Offense Level ............................................. 27
14     III. Sentencing Argument.................................................. 29
15          A. Summary of Argument............................................. 29
            B. General Principles ................................................... 30
16          C. Specific Factors Justifying Variance ........................... 33
17                1.   Defendant's Severe Gambling Addiction and his
                       Participation in Effective Treatment and
18                     Rehabilitation and his Need for Continued
19                     Treatment Strongly Supports a Reduction in
                       the Custody Portion of his Sentence and
20                     Replacement of it with a Means of Continuing
21                     his Program of Rehabilitation.............................. 33
                  2.   Principles of Disparity of Sentencing Together
22                     with the Fact that the Guidelines Reliance
23                     on the Loss Amount as a Surrogate for Culpability
                       is Not a Valid Basis for Determining
24                     Either the  Defendant's Culpability or the
                       Need for a Particular Level of  Punishment
25                     Support a Far Lower Custody Sentence in this
26                     Case   Than Called for Under the Now Advisory
                       Guidelines ................................................... 37
27                3.   A Combination of Mitigating Factors Considered
28                     Separately or Together Militate in Favor of a
                       Significantly Lower Sentence than the Guidelines

Sentence ................................................................. 42

    (a)   The Criminal Conduct in this Case (even
          though it was carried out by a series of
          facts over time) was aberrant ...................... 43

    (b)   Defendant's mental and emotional history,
          and the stress he was subjected to
          supports a mitigated sentence.................... 46

    (c)   Defendant has shown extraordinary and
          acceptance of  responsibility.................... 47

    (d)   Defendant has shown extreme remorse..... 49

    (e)   The loss was not caused solely by
          Defendant's conduct (i.e., there were multiple
          causes of that loss)........................................ 49

    (f)   The combination of factors justifies a
          substantial reduced sentence, even if
          alone none would ......................................... 50

IV.    Conclusion............................................................................. 53

Exhibits

1

# TABLE OF AUTHORITIES

2

Booker v. United States, 543 U.S. 220.............................31, 32, 34, 35, 36, 38, 39,
   125 S.Ct. 738, 160 L.Ed. 2d 621 (2005)          45, 46, 51, 52

Gall v. United States, –U.S. --.....................................................................32, 36
   128 S.Ct. 586, 169 L.Ed.2d 445 (2007)

Kimbrough v. United States, 128 s.Ct. 558 (2007)....................................32, 42, 49

Koon v. United States, 518 U.S. 81.........................................30, 31, 35, 36, 47, 50
   116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)

Rita v.United States, –U.S. –, 127 S.Ct. 2456..........................................31, 41, 42
   168 L.Ed.2d 203 (2007)

United States v. Ameline, 409 F.3d 1073 (9th Cir. 2005).................31, 45, 46, 53

United States v. Aragbaye, 234 F.3d 1101 (9th Cir. 2000),................................28

United States v. Arutunoff, 1 F.3d 1112 (10th Cir. 1993)...................................49

United States v. B. Roe, 976 F.2d 1216...............................................................50

United States v. Brown, 985 F.2d 478 (9th Cir. 1993).......................................47

United States v. Carty, –F.3d –, ........................................................31, 36
   2008 WL 763770 9th Cir. 3/24/08 (en banc)

United States v. Dickey, 924 F.2d 836 (9th Cir. 1991).......................................46

United States v. Fagan, 162 F.3d 1280 (10th Cir. 1998)....................................49

United States v. Fairless, 975 F.2d 664 (9th Cir. 1992)......................................45

United States v. Farrier, 948 F.2d 1125 (9th Cir. 1991).....................................48

United States v. Fernandez, 443 F.3d 19 (2d Cir. 2006).....................................38

United States v. Garcia, 182 F.3d 1165 (10th Cir. 1999)....................................46

United States v. Gorsuch, 404 F.3d 543 (1st Cir. 2005).....................................53

United States v. Grant, 172 F.3d 59........................................................36
   1999 W.L. 65109 (9th Cir. 1999)

United States v. Gregorio, 956 F.2d 341 (1st Cir. 1992).....................................49

United States v. Grier, 499 F.3d 558 (3rd Cir. 2006)..........................................38

United States v. Huerta-Rodriguez, 355 F.Supp.2d 1019 (D.Neb. 2005)...........38

United States v. Hunt, –F.3d.–.............................................................38
   2006 WL 2285725 (11th Cir. August 10, 2006)

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

United States v. Jaber, 352 F.Supp.2d 365 (D.Mass 2005)....................................38

United States v. Jarozenko, 92 F.3d 486 (7th Cir. 1996).......................................49

United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006)..........................38

United States v. Jones, 158 F.3d 492 (10th Cir. 1998).......................33, 34, 46, 47

United States v. Lam, 20 F.3d 999 (9th Cir. 1994)...............................................45

United States v. Lane, 765 F.2d 1376 (9th Cir. 1985)..........................................41

United States v. Martin, 826 F.Sup. 232 (S.D.N.Y. 1993)....................................33

United States v. Menyweather, 431 F.3d 692 (9th Cir. 2005)..................51, 52, 53

United States v. Miller, 991 F.2d 552 (9th Cir. 1993)..........................................48

United States v. Morales, 972 F.2d 1007 (9th Cir. 1993).....................................45

United States v. Myers, 353 F.Supp. 2d 1026 (S.D. Iowa 2005).........................38

United States v. Navedo-Conception, 450 F.3d 54 (1st Cir. 2006).....................38

United States v. Patel, 762 F.2d 784 (9th cir. 1985).............................................41

United States v. Ranum, 353 F.Supp.2s 984 (E.D. Wis. 2005)...........................38

United States v. Rivera, 994 F.2d 942 (1st Cir. 1993)..........................................50

United States v. Rostoff, 53 F.3d 398 (1st Cir. 1995)..........................................49

United States v. Ruff, 535 F.3d 999...................................................................36

United States v. Sanchez-Rodriguez, 161 F.3d 556 (9th Cir. 1998)..............36, 47
    (en banc)

United States v. Stozek, 783 F.2d l891 (9th Cir. 1985)........................................41

United States v. Tokai, 941 F.2d 738 (9th Cir. 1991)...........................................45

United States v. Wellington, 754 F.2d 1457 (9th Cir. 1985)..............................41

United States v. Whitehead, 532 F.3d 991 (9th Cir. 2008)...........................36, 51

United States v. Whitney, 785 F.2d 824 ((th Cir. 1986).......................................41

United States v. Williams, 65 F.3d 301 (2nd Cir. 1995).......................................31

United States v. Working, 224 F.3d 1092 (9th Cir. 2000) (en banc)................45

Plea Agreement.................................................................................................27

PSR................................................................................................2, 28, 37

18 U.S.C. Section 3553(a).................................................29, 31, 32, 35, 37, 38, 39, 40

18 U.S.C. Section 3553(a)(1)......................................................................52

18 U.S.C. Section 3553(a)(2)(D)..............................................................33, 35

18 U.S.C. Section 3882(a)........................................................................36, 47

U.S.S.G. Section 2B1.1(b)(9)...................................................................21, 28

U.S.S.G. Section 5C1.1(d)(2)...................................................................36, 47

U.S.S.G. Section 5H1.1...............................................................................35

U.S.S.G. Section 5H1.1-6.............................................................................31

U.S.S.G. Section 5H1.3...........................................................................35, 46

Hofer, Paul and Semisch, Courtney, *Examining Changes in Federal Sentence Severity, 1980-1998*, 12 Fed.Sent.Rep. 12, 1999 W.L. 1458615 (July/August 1999)....................................................39, 40

Hofer, Paul J., *Immediate and Long-Term Effects of United States v. Booker; More Discretion, More Disparity, or Better Reasoned Sentences?, 38 Ariz.St.L.J. 425 (2006)*.......................................................38

United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of the Sentencing Reform Act (2004)*.............................................................................................39, 40

United States Sentencing Commission, *Supplementary Report on the Initial Sentencing Guidelines and Police Statements (1987)*..............................39

Random House Dictionary (2nd Ed. Unabridged) (1987)..................................43

1  JAMES D. RIDDET, ESQ.  (SBN 39826)
   STOKKE & RIDDET
2  3 MacARTHUR PLACE, SUITE 750
   SANTA ANA, CA   92707
3  TELEPHONE: 714/662-2400
   FACSIMILE: 714/662-2444
4  E MAIL: JRiddet@stokkeriddet.com

5  Attorneys for Defendant

6

7                    **UNITED STATES DISTRICT COURT**

8                    **CENTRAL DISTRICT OF CALIFORNIA**

9

   UNITED STATES OF AMERICA,          )        Case No. CR 09-0757 JFW
10                                     )
                  Plaintiff,           )        POSITION OF DEFENDANT,
11                                     )        BRADLEY LEWIS RUDERMAN
            vs.                        )        ON SENTENCING FACTORS AND
12                                     )        SENTENCING BRIEF
   BRADLEY LEWIS RUDERMAN,            )
13                                     )
                                       )
14                                     )        Date: January 4, 2010
                  Defendant.           )        Time: 10:00 AM
15  _____   )

16                  **NOTICE OF UNDER SEAL FILING**

17         Counsel respectfully requests that the Court refer to the separate Under Seal

18  Filing as well as this brief in determining the appropriate sentence in this case.

19                                    **I.**

20                            **INTRODUCTION**

21         Mr. Ruderman has entered a plea in this court pursuant to a Plea Agreement

22  which provides for a total guideline level of  32 with a sentencing range of 121-151

23  months. The government agreed to recommend a two-level variance for extraordinary

24  acceptance of responsibility which would result in a total offense level of 30 with a

25  sentencing range of 97 to 121 months.[1]  The government reserved the right to argue

26

27         [1] Mr. Ruderman came freely to the government and set forth in great detail all
   of his criminal conduct and additionally provided the government with boxes of
28  records and schedules all of which the government concurs made the job of
                                                                    (continued...)

                                        1

1 for an additional two levels for sophisticated means. The government recommends that
2 the Court impose the low end of the appropriate guideline level.

3      The PSR computes the total offense level at 34 and recommends at two level
4 variance for extraordinary acceptance of responsibility with a resulting total offense
5 level of 32 and a sentencing range of 121-151 months. The PSR recommends that the
6 Court impose a sentence of 121 months.

7      In this brief, counsel will set forth objections to certain portions of the PSR
8 along with a number of facts and circumstances which clearly suggest a variance of a
9 number of levels. These include the following: (1) Mr. Ruderman's conduct in coming
10 forward before he knew there was any complaint or investigation pending as well as
11 providing records and detailed schedules to ease the government's job in tracing
12 transactions is deserving of a greater variance than 2 levels; (2) Mr. Ruderman is
13 addicted to gambling and will present evidence from experts on gambling addiction
14 which explains how that addiction contributed to his illegal conduct in this case; (3)
15 Mr. Ruderman has sought treatment for gambling addiction and excessive drinking by
16 enrolling in Beit T'Shuvah, a live in facility established in 1986 to assist Jewish men
17 and women and since that time has been provided counseling treatment for a variety
18 of addictions and problems. Mr. Ruderman entered Beit T'Shuvah on April 28, 2009,
19 just a few days before his first interview with the government; (4) Mr. Ruderman has
20 provided extensive cooperation with the SEC Receiver and the Bankruptcy Trustee in
21 assisting them to locate and retrieve assets and funds that can be used to reimburse the
22 investors for some of their losses; (5) there are a number of circumstances about this
23 case and about Mr. Ruderman's conduct which strongly suggest that the loss figure
24 stipulated to in the Plea Agreement and used by Probation to calculate the guideline
25 level significantly overstates Mr. Ruderman's conduct; (6) Mr. Ruderman's post
26 offense conduct strongly suggests rehabilitation to a great extent.

27

28     [1](...continued)
investigating and prosecuting Mr. Ruderman a great deal easier.

## II.

## **RELEVANT FACTS**

### A.

### **Defendant's Background**

Mr. Ruderman was born in Los Angeles on January 24, 1963. His father, David Ruderman, was employed as an investment advisor with various companies and now works at Morgan Stanley. His mother was a housewife.

Mr. Ruderman was raised in the Los Angeles area and attended high school at University High School in Los Angeles graduating in 1981. Following graduation from high school, he enrolled at UCLA majoring in political science. He received his Bachelor of Arts in 1986. He graduated with honors and achieved an overall grade point average of approximately 3.5 on a 4.0 scale.

Upon graduating from college, he first worked at Lehman Brothers on Wall Street in New York working as an associate in investment management. He remained at Lehman Brothers until 1994. He worked as an associate until 1989. In that position, he worked as an analyst for the senior portfolio manager. In 1989, he moved into Private Wealth Management where he had his own clients.

After Mr. Ruderman left Lehman Brothers, he obtained employment at Donaldson, Lufkin & Jenrette, an investment banking firm where he also worked in Private Wealth Management. He was Senior Vice President.

In 1996, Mr. Ruderman moved to Merrill Lynch working in the Private Wealth Management department. He had the same title as the previous employment, Senior Vice President. Mr. Ruderman remained at Merrill Lynch until 1998 at which time, he obtained employment at Bear Stearns working as the Managing Director of the Private Wealth Management department. He remained at Bear Stearns for 10 months. While there, he had a dispute with a client, who believed that Mr. Ruderman had conducted unauthorized trades. That resulted in discipline by the New York Stock Exchange in which he was directed to pay a fine of $5,000. The exchange found that

he had done unauthorized trading for the client in that he purchased for the client stocks or bonds without the client's specific authorization. In addition the New York Stock Exchange found that he had done the same thing for other clients. There was no evidence of self dealing, and, although Mr. Ruderman purchased the investments without authorization, the investments were made on the account of the client.

In 1999, Mr. Ruderman started Ruderman Capital Management, the purpose of which was to make investments with his own funds and funds of family members. At the end of 2002 or early 2003, Mr. Ruderman formed Ruderman Capital Partners LLC, as he had begun to accept investor funds outside of his family.

Mr. Ruderman married the former Blair Belcher, whom he had met through a friend. They were married in 1992 and lived together as husband and wife until July 1998. The couple had no children. Their relationship today is very good.

Mr. Ruderman's mother passed away on January 10, 2008. Mr. Ruderman had come from a very close family and this death was extremely painful for him. His mother was diagnosed with cancer in 1999 and told by the doctors that she would live only another 12 to 24 months. In fact, she lived another 8 years. During the last several years of his mother's life, she constantly battled the cancer and was often in a great deal of pain. During much of this time, Mr. Ruderman helped to care for his mother by daily going to see her and spending time with her, feeding her and taking her to doctors when necessary.

**B.**

**Voluntarily Coming to the Government**

As the Court can see from the Factual Basis in the Plea Agreement, Mr. Ruderman was losing money for clients but concealing that fact by providing them with false statements making it appear that the portfolio was doing well. In March 2009, Mr. Ruderman was approached by his ex-wife who knew of an investor who wanted to invest with him. This investor was very well to do being worth over one billion dollars. The investor instructed that Mr. Ruderman meet with his investment

4

1  advisors.  Mr. Ruderman set up a meeting and then elected not to follow through,
2  because at that time, it was obvious that he could not continue as he had been in the
3  past. He also had another opportunity to invest for a major investor and again elected
4  not to proceed for the same reasons.  In fact, as of March 2009, Mr. Ruderman had
5  decided not to take any new investors.

6        One of the opportunities that Mr. Ruderman had to invest for a major investor
7  came to him through Rabbi Mark Borovitz, who is the chief spiritual advisor at Beit
8  T'shuvah and who did the eulogy for Mr. Ruderman's mother when she passed away.
9  Mr. Ruderman met with the Rabbi on approximately the third week in March.  After
10 that meeting, Mr. Ruderman began to drive home, when he pulled over and had a
11 breakdown deciding that he had to put a stop to what he was doing and come forward
12 and confess his illegal conduct.    When Mr. Ruderman went home, he seriously
13 contemplated suicide and the next day went to a gun store but learned that there was
14 a waiting period.  This told him that this was a sign from above and he did not
15 purchase the gun.

16       A couple of days later, he scheduled a meeting with Michael Perlis, Esq., at
17 Stroock, Stroock & Lavan, who was a friend of his father's. He explained to Mr. Perlis
18 what he had done and that he wanted to make a full breast by going to the FBI or some
19 other agency and fully confessing to his actions. Mr. Perlis contacted the undersigned
20 who met with Mr. Ruderman the next day.  After a lengthy meeting in which Mr.
21 Ruderman made it clear that he wanted to come forward and confess what he had done,
22 counsel called Rob Adkins, Chief of the Santa Ana Office of the United States
23 Attorney's Office.   Counsel advised Mr. Adkins that he had a client who had
24 committed a serious fraud and wanted to come forward and confess to what he had
25 done. Mr. Adkins stated he would assign the matter to an AUSA and have that person
26 call counsel; however, he called back a day or two later and advised that there was an
27 AUSA in Los Angeles who already had a file open.  Counsel then contacted AUSA
28

1  Ranee Katzenstein and made arrangements for an interview. No request was made for
2  immunity or a proffer letter.

3      A meeting was arranged at the United States Attorney's Office for April 30,
4  2009. Mr. Ruderman brought with him to the meeting approximately 8 boxes of
5  documents and computer drives consisting of all the materials and records he had as
6  to his activity. He then sat down for an interview with Assistant United States
7  Attorneys Ranee Katzenstein and Cheryl Murphy accompanied by two federal agents.

8      The interview took about three hours. Counsel accompanied Mr. Ruderman and
9  took detailed notes on a laptop computer. [Attached as Exhibit 1 is a copy of counsel's
10  notes of that meeting.]   As indicated in Exhibit 1, Mr. Ruderman passed out a number
11  of schedules that he had prepared to aid the government in understanding his conduct
12  and tracing what was done. [Copies of these 6 schedules are attached as Exhibit 2.]

13      The schedule marked with a letter "A" is a schedule Mr. Ruderman prepared for
14  his meeting with the government which documents the remaining assets of Bradley
15  Ruderman and related entities, expenses from 2003 to April 2009, and investment
16  performance. The schedule marked with a letter "B" is a schedule prepared by Mr.
17  Ruderman for his meeting with the government, which is a complete list of
18  clients/members of Ruderman Capital Partners, Ruderman Capital Partners A, capital
19  contributions and capital withdrawals. The schedule marked with a letter "C" was
20  prepared by Mr. Ruderman for the meeting with the government, which shows the
21  banking activity of Ruderman Capital Management from 2003 - 2009.   The schedule
22  marked with a letter "D" was prepared by Mr. Ruderman for the meeting with the
23  government which shows banking activity for Bradley L. Ruderman. The schedule
24  marked with a letter "E" was prepared by Mr. Ruderman for the meeting with the
25  government which is banking activity for Ruderman Capital Partners. The schedule
26  marked with a letter "F" was prepared by Mr. Ruderman for the meeting with the
27  government which shows banking activity for Ruderman Capital Partners - A from
28  2006, which is when that entity was formed. It is Mr. Ruderman's estimate that the

time he took to prepare these 6 schedules was approximately 40 hours and required him to order bank statements and credit card statements. He then had to review 7 years of bank statements and other records in order to prepare these schedules.

In addition to the above schedules, Ruderman prepared one additional schedule. [Attached as Exhibit 3 is a copy of a schedule entitled ANCILLARY TRANSFERS OF INVESTOR FUNDS.] This schedule documents improper payments of investor funds to fulfill outside business obligations.

The prosecutors reviewed all of this information and eventually presented counsel with a proposed Plea Agreement, which Mr. Ruderman eventually signed. Arrangements were made for Mr. Ruderman to surrender to the FBI office. The government requested a second interview; so following his surrender, he was brought to the United States Attorney's office for another interview which lasted approximately 1 ½ hours. [Attached as Exhibit 4 are counsel's handwritten notes of that meeting.]

## C.

## **Facts Related to Loss**

In the Plea Agreement, the parties agreed to loss for purpose of calculating the guideline level in the range of $20 million to $50 million which requires an additional 22 levels. The Factual Basis states that 22 investors invested $44.3 million and that $19.2 million was distributed back to the investors. It is also stated in the Factual Basis that Mr. Ruderman took approximately $9 million to pay for personal expenses. It is worthy of note that the Factual Basis also contains the following language: "Defendant Ruderman did place some of the funds he collected in investments with the intent that he make money for his clients with those investments."

The government has taken the position that the loss in this case is the total amount that Mr. Ruderman collected from investors: $44.3 million dollars. The PSR agrees with that figure. However, although Mr. Ruderman and counsel agreed that sum could be used in calculating the appropriate guideline level, there are important facts in this case which strongly suggest that the Court should depart or order a

7

1  variance from the guideline level on the basis that the loss figure significantly
2  overstates the improper conduct of Mr. Ruderman.

3      In the first place, as the government agrees, of the $44.3 million collected by Mr.
4  Ruderman to invest, $19.2 million was funds that investors requested from the fund
5  and which Mr. Ruderman then honored by sending them the funds they requested thus
6  resulting in a net loss of $25.1 million.[2]

7      In addition to the above, we do not believe it is disputed that of the $25.1
8  million net loss to investors, a portion of that is losses that occurred when Mr.
9  Ruderman made legitimate investments pursuant to the terms of the partnership
10 operating agreement. Unfortunately, those investments did not perform as Mr.
11 Ruderman anticipated. [Note that the government agreed to place in the Factual Basis
12 that Mr. Ruderman did actually invest funds with an intent to make money for his
13 clients.) Attached as Exhibit 7 is a schedule prepared by Mr. Ruderman entitled
14 INVESTMENT PERFORMANCE OF INVESTOR FUNDS. As the Court can see, the
15 schedule breaks down investment performance into several categories. The first
16 category is losses that Mr. Ruderman incurred by investing his own funds. That
17 amount of trading losses is $21,449.24. The second category is investment
18 performance of Ruderman Capital Management LLC, which does show trading losses
19 of investor funds. As the Court can see, there were trading losses of $57,687.94. The
20 next category is investment performance for Ruderman Capital Partners, LLC, which
21 shows additional trading losses for investors in the sum of $5,107,804.31. The next
22 category is Ruderman Capital Partners A, LLC. That shows that there were trading
23 *gains* in the sum of $323,131.90. In addition to the trading losses, Mr. Ruderman

24

25      [2] It should be noted that in Paragraph 24 of the PSR, the probation officer states
26 that the case agent has stated that the net loss is $27,585,849. The reason for the
   difference is that 7 investors invested funds and later changed their minds and made
27 a complete withdrawal of all funds invested. Attached as Exhibit 6 is a schedule
   showing all amounts collected and all amounts returned. The following investors
28 received back their entire investment plus a percentage return: Elins Family Trust; Dhir
   Family Trust; Malibu Trading & Investing L.P.; Koff Living Trust; Hillman Revocable
   Trust; Banks JT; Todd Figi Ira.

1  incurred other losses with investor funds.  Losses were incurred in various sponsored
2  private equity funds in the sum of $232,628.62.  The total of these losses for trading
3  and other investments is $5,096,438.10.[3] If that number is subtracted from the net loss
4  of $25.1 million, the total is $20,035, 935.  We respectfully suggest subtracting the
5  amount of losses through 2008, because they were not as a result of Mr. Ruderman
6  taking funds for an improper purpose but were instead were the result of trading and
7  other investment losses incurred by him during the time that he was attempting to place
8  investments that would make a good return for his clients. [Mr. Ruderman believes that
9  when 2009 losses is also subtracted that the figure will be well below $20 million.  It
10  is his estimate that the 2009 reports will show at least an additional $3 million to $4
11  million in legitimate losses. Thus it is believed that the $20 million will be reduced to
12  approximately $16 million to $17 million.]

13       As indicated in the Plea Agreement, Mr. Ruderman agreed that he took
14  "approximately" $9 million for personal use.   In fact that actual figure is
15  $8,658,718.04. [See Exhibit 8.] In addition, Mr.  Ruderman used the sum of
16  $6,572.728.51 to pay obligations arising from outside business activities, a large
17  portion of which were people or entities who also invested in the fund which is the
18  subject of this case. [See Exhibit 3.][4]

19       Accordingly, it is respectfully submitted that the total of the personal use funds
20  and the funds to pay outside business obligations is a sum which represents Mr.
21  Ruderman's improper conduct in that he used those funds for purposes totally

22

23

24

---

25  [3] These figures include losses only up through year end 2008.  Mr. Ruderman
   has not received the year end brokerage profit and loss reports for 2009, but believes
26  there were substantial   additional  losses in that year.   Since the Receiver and
   Bankruptcy Trustee are now operating his businesses, it is expected that the annual
27  reports will go to them.

28  [4] As will be seen later in this brief, Mr. Ruderman is working with the SEC
   Receiver and the Bankruptcy Trustee to recover these funds, since they were
   improperly paid to the persons or entities that received them and thus should be
   refunded.

1 unrelated to the purpose for which the funds were given to him.  The total of those is
2 $15,231,446.

3       In addition to the above, it is important to note how Mr. Ruderman lived during
4 his fraudulent conduct.  This is not a man who used his investor funds to purchase a
5 lavish lifestyle.  He did not purchase any real estate, or any boats or any planes.  He
6 purchased one vehicle, a 2004 Porsche for $60,000 and rented another 2003Porsche
7 for approximately $120,000.  He did not purchase any expensive jewelry or wine and
8 lived modestly, living in a two bedroom rented house in Beverly Hills which had total
9 space of approximately 1700 square feet with no garage.  When Mr. Ruderman came
10 forward to the government, his total assets consisted of his 2004 Porsche, various
11 furniture and furnishings, a modest collection of clothing and approximately $800 in
12 a bank account.

13                                      **D.**

14              **Facts Relating to Defendant's Gambling Addiction**

15       As discussed herein, Mr. Ruderman lost over $5 million of investor funds in
16 gambling losses.  This would strongly suggest, that he probably had a gambling
17 addiction that had long gone untreated and that probably was a factor in his illegal
18 conduct.  As indicated in the Beit T'Shuvah section, he is now getting much needed
19 treatment and counseling for this addiction.

20       Mr. Ruderman was referred to Timothy W. Fong, an expert in gambling
21 addiction.  Attached as Exhibit 21 is Dr. Fong's CV.  As the Court can see, Dr. Fong
22 is board certified by the American Board of Psychiatry and Neurology in both
23 Psychiatry and Addiction Psychiatry.  Since 2004 he has been associated with the
24 UCLA School of Medicine in the Semel Institute of Neuroscience and Behavior
25 Department of Psychiatry and Biobehavorial Sciences and is a Clinical Professor as
26 well as the Director of the Impulse Control Disorders Clinic and the UCLA Addiction
27 Medicine Clinic.  He is Co-Director of the UCLA Gambling Studies Program.

28

1    At the request of Dr. Fong a Neuropsychological Examination Report was
2 prepared by the UCLA Neuropsychiatric Hospital. Attached as Exhibit 22 is a copy
3 of that report signed by Erica Coady, PhD, Neuropsychology Postdoctoral Fellow,
4 Jeffrey Schaeffer, PhD, Clinical Professor of Psychiatry and Behavioral Sciences and
5 Bill Steh, PhD, Assistant Clinical Professor, Associate Director of Clinical Services.
6 As can be seen from the first page of this report, the examination and testing
7 consumed three sessions with a total of 12 hours. The report indicates in the summary
8 of findings that while Mr. Ruderman "is likely performing in the high average range
9 on most tasks of non-verbal intellectual functioning, he is in the low average range on
10 tasks of verbal intellectual functioning." This could represent a long-standing verbal
11 weakness or learning disorder. As to the matter of whether there is evidence of
12 gambling addiction, the report states the following: "Based on these findings, it
13 appears that Mr. Ruderman has at least mild difficulty on a selective basis organizing
14 visuo-spatial material when the information is complex, and he becomes overwhelmed,
15 a finding that perhaps is at least somewhat consistent with published neuroimaging
16 studies of orbital-frontal functioning in individuals *with gambling and other impulse*
17 *control related disorders...".* [Page 12]

18    At the end of the report, the authors strongly recommend that Mr. Ruderman
19 "continue to participate wholly in his gambling program and follow all
20 recommendations of the program treatment and aftercare." It is also recommended
21 that Mr. Ruderman continue with counseling with Dr. Fong.

22    Attached as Exhibit 23 is a medical and psychiatric evaluation prepared by Dr.
23 Fong. Dr. Fong points out that Mr. Ruderman began gambling as a preteen and was
24 a social gambler throughout his adult life. It is his opinion that his gambling did not
25 become addictive until approximately 2006. He began a series of high stakes poker
26 games with 20 or so others, some of whom were high profile individuals. Dr. Fong
27 then states: "As the losses mounted, he reported feeling more desperate and
28 preoccupied with gambling. He was also chasing his losses and unable to stop."

11

Dr. Fong's psychiatric finding is one of pathological gambling. He found that Mr. Ruderman "meets a diagnostic criteria" for pathological gambling. One of the issues that Dr. Fong addressed specifically is whether and to what extent the gambling addiction contributed to his illegal conduct in this case. On that subject, Mr. Fong states the following: "Pathological gambling has biological psychological and social roots and is a treatable condition. *One of the core symptoms includes committing illegal acts to support ongoing gambling activities. Nearly 25% of pathological gamblers commit criminal acts during the course of their illness. It is important to note that prior to the development of a gambling problem, Mr. Ruderman did not have a repeated history of criminal behavior.*"

Counsel for Mr. Ruderman does not mean to suggest that Mr. Ruderman's gambling addiction is an excuse for his illegal behavior. However, it is respectfully submitted that given this addiction, Mr. Ruderman's conduct is not that of a purely immoral person and thus, when the Court considers the factors enumerated in 18 U.S.C. §3553, the Court will consider whether this gambling addiction bears on "the nature and circumstances of the offense and the history and characteristics of the defendant.

## E.

### Beit T'Shuvah

As indicated above, Mr. Ruderman entered the program at Beit T'Shuvah on April 28, 2009. This date was approximately two weeks after meeting with counsel and one or two days before his first interview in the United States Attorney's Office.

Shortly before he entered the program he had attempted to purchase a gun to commit suicide. A day or two after the attempt to buy a gun, he met with his family and apprised them of what he had done. After meeting with a securities lawyer and making arrangements to meet with counsel herein, his father advised him that he has serious behavioral problems and compulsive addictions which required treatment and recommended that he enter the program to receive that treatment. [Attached as

1 Exhibit 9 is a letter from the Assistant Alternative Sentencing Coordinator at Beit
2 T'Shuvah attesting to the fact that Mr. Ruderman enrolled on that date and briefly
3 explaining the program.] As the Court can see, this is a long term residential facility
4 which was established in 1986 "as a response for the need to assist Jewish men and
5 women who had lost their moral, ethical, and spiritual compass."

6     On October 16, 2009, counsel went to the facility and met with a number of the
7 employees and counselors including Rabbi Mark Borovitz, who is the chief spiritual
8 counselor, Kathy Mark, Chief Clinical Director, and Carrie Newman, Alternative
9 Sentencing Coordinator. At counsel's request, the staff provided me with a number
10 of reports and brochures more fully explaining the program. [Attached as Exhibit 10
11 is a brochure about the facility. Attached as Exhibit 11 are various articles about the
12 facility. Attached as Exhibit 12 is a letter from the California Department of
13 Corrections attesting to the excellent staff and treatment at the facility. Attached as
14 Exhibit 13 is the current schedule for all residents.]

15     Counsel also requested that Carrie Newman write to the Court a detailed letter
16 about Mr. Ruderman's progress in the program. [Exhibit 14.] There are a number of
17 statements in this letter which are extremely important in the Court's decision as to the
18 appropriate sentence in this case. Counsel is informed that 60 % of the residents are
19 court committed.

20     1.    Mr. Ruderman at first was quiet and had trepidations about participating
21           in the program;

22     2.    He felt that he had nothing in common with the other residents;

23     3.    Mr. Ruderman began to realize that compulsive gambling emanates from
24           the same "spiritual malaise and emotional deficits as other" addicts;

25     4.    Once Mr. Ruderman began to realize this, he began to "immerse himself
26           in the program;

27     5.    This meant having to face some "awful truths", but he did it;

28

13

6.  Mr. Ruderman began attending daily meetings of the Gambler's Anonymous 12 step program as well as Alcoholics Anonymous meetings;

7.  Mr. Ruderman is a compulsive gambler,[5] and this "fueled the financial crimes he engaged in";

8.  Mr. Ruderman is currently a level 3 resident - there are 4 levels, and level 4 people have jobs on the outside and are going back into society;

8.  Mr. Ruderman also attended a new 12 Step program of Criminals and Gang members Anonymous which was founding in 1996 by a group of inmates serving life sentences;

9.  Mr. Ruderman is taking a leadership role in that program and is the secretary of the weekly CGA meetings in West Los Angeles;

10. Mr. Ruderman has also participated in the Partners in Prevention program;

11. Mr. Ruderman is an intern at the Career Center which assists residents in obtaining employment and has helped residents create resumes and prepare for interviews;

12. Mr. Ruderman has also lead a fitness program at the center; Beit T'Shuvah is the only Jewish Charity recognized by the Los Angeles Marathon, and Mr. Ruderman is leading the training for the marathon;

13. Mr. Ruderman was one of the featured speakers at the California Department of Alcohol and Drug Programs Office of Problem Gambling Seminar on Oct 21 - 24, 2009;

14. Mr. Ruderman is presently attending classes at UCLA in pursuit of a California Association of Alcohol and Drug Abuse Counselors (CAADAC) certification;

---

[5] A report from an expert in gambling addiction has been presented in a separate section of this brief.

1    Ms. Newman concludes her letter to the Court with a suggestion that the Court

2    consider as part of the sentence continued residence at the facility as a condition of

3    probation (or supervised release).

4    In addition to Ms. Newman's letter, additional letters have been written by

5    personnel at Beit T'Shuvah. Attached as Exhibit 25 is a letter from Gregory D.

6    Metzger, who is the Spiritual Counselor at Beit T'Shuvah. Mr. Metzger writes that he

7    has come to know and respect Mr. Ruderman and has observed that he "openly speaks

8    before groups of recovering gamblers and addicts about the harm he has wrought, the

9    remorse he experiences and his commitment to amend his failures by repairing, to the

10   best of his ability, the damage for which he takes responsibility." Attached as Exhibit

11   26 is a letter from Kathy Marks, Clinical Director at Beit T'Shuvah who writes to

12   inform the Court of Mr. Ruderman's progress in the program and respectfully

13   recommend a sentence. She write that while Mr. Ruderman at first "often minimized

14   his actions," as the treatment continued he began to come to terms with a number of

15   things including his wrongful conduct in this case. She observes that Mr. Ruderman

16   meets all the diagnostic requirements for Pathological Gambling and also has a long

17   history of depression and anxiety. On the last page of her letter, she summarizes the

18   amazing progress that Mr. Ruderman has made in the program including fully

19   admitting responsibility for his illegal actions, demonstrated remorse and a plan for

20   restitution, family therapy, starting open GA meetings, participating in Volunteers in

21   Partners in Prevention and participation in the career center "by aiding with various

22   phases of job search. She also notes that Mr. Ruderman has attended a conference by

23   the National Council on Problem Gambling. She recommends that this Court give

24   serious consideration to "a lengthy probation and continue treatment at Beit T'Shuvah

25   in lieu of Federal prison time...."[6]  Attached as Exhibit 27 is a letter from Lydia

26   

27   [6]Mr. Ruderman and counsel understand that it is not realistic to hope that this Court will impose no prison time and impose instead a lengthy period of probation

28   with conditions including continue participation in the Beit T'Shuvah program. However, it is respectfully submitted that this wonderful program should be seriously

(continued...)

Buchman, who is employed at Beit T'Shuvah as a career counselor and is the on site career counselor. She writes that Mr. Ruderman volunteered his services in the career center four months ago and has assisted in preparing residents for job searches and interviews as well as assisting residents in preparation of their resumes. "Brad has become an essential asset to residents, me, and the goals of the career center in general." Ms. Buchman is with Mr. Ruderman five days per week and has observed that he has "faced up to his unacceptable actions" and "continues to express sincere regret, remorse, and repentance for these actions and those harmed." In conclusion, she states the following: "I have developed a meaningful working relationship with Brad during the 6 months. He is taking active and conscious steps to make valuable contributions to the community and lead a productive and lawful life. I am confident that he has turned his life around and will *not repeat* his unlawful and unacceptable behavior in the future."

The Senior Rabbi at Beit T'Shuvah is Rabbi Mark Borovitz. Attached as Exhibit 32 is a letter from Rabbi Borovitz. He begins by noting his significant past problems with alcoholism and criminal conduct including serving time in penal institutions and states that 21 years ago he had a Spiritual Awakening and since then has dedicated his life to helping others. He states that he has known Mr. Ruderman for many years and in the past was "an arrogant, mean and conceited young man" who had no interest in Beit T'Shuvah. "He knew everything and could not hear anything that anyone else had to say if it didn't agree with his view." Mr. Ruderman in fact asked for his help, because the hedge fund had lost investors. Rabbi Borovitz made a call for Mr. Ruderman and an appointment was set up to see the person he called. However, Mr. Ruderman realized he could not continue on with his lies and instead went to the United States Attorney's Office moving into Beit T'Shuvah the same week.

---

[6](...continued)
considered as a substantial factor supporting a variance to a much shorter prison sentence than suggested by application of the advisory guidelines.

Rabbi Borovitz then relates Mr. Ruderman's progress at Beit T'Shuvah which has been stellar.   In light of his background, he believes he is able to determine whether someone is conning him or not: "As I said at the beginning of this letter, Judge Walter, I am acutely aware of cons.  I can say without reservation that the change in Bradley Ruderman is sincere and real. Bradley has given the same energy to being in recovery that he did in hiding and lying an cheating others."  At the conclusion of Rabbi Borovitz's letter, he notes that admitting his wrongdoing is the first step toward change.  He has done that, and the Rabbi respectfully request you to consider no imposing a long prison term as it "will not, in my humble opinion, serve the victims, society and/or Bradley."

The Case Manager for Mr. Ruderman at Beit T'Shuvah is Adam Mindel, Program Coordinator at Beit T'Shuvah.  Attached as Exhibit 33 is a letter from Mr. Mindel stating that he has seen "Brad fine humility towards his crime, empathy towards his victims, and has consistently been willing to engage in the process of introspection and face his life issues along with the past. " He points out that Mr. Ruderman is in an active leadership role at Beit T'Shuvah and has worked in the career office coaching others.

Counsel is informed that many of the residents at Beit T'Shuvah are very supportive of Mr. Ruderman and plan to attend his sentencing hearing.  Attached as Exhibit 34 are 3 letters from residents at the facility: Bonnie Reich, Jeff A. Michaelson and Nathan Cohen.    These letters demonstrate that Mr. Ruderman has taken a very supportive role with other residents at Beit T'Shuvah in that he has counseled them and coached them. All believe that during Mr. Ruderman's stay at Beit T'Shuvah, he has matured and began to fully appreciate the problems he has and has worked to change himself for the better.

This is a facility that has a national reputation of assisting offenders to deal with various addictive and anti-social problems.  Mr. Ruderman has been in the facility since April 28, 2009, and as seen has made remarkable progress towards rehabilitation.

**F.**

**Assistance in Retrieving Funds to Pay Investors**

In addition to this criminal case, there are two related civil proceedings which have in effect taken over the business that Mr. Ruderman was running. One of these is an action filed by the SEC and the other is an action brought by one of the investors to bring the company into bankruptcy. The Receiver appointed by the court on the SEC case, David Ray, and the Trustee appointed by the Bankruptcy Court, Howard Ehrenberg, have divided up the companies. The trustee is working on Ruderman Capital Partners and the Receiver is working on Ruderman Capital Partners A. Obviously, their interest is to recover as much assets and funds as possible so that the investors receive as much of their money back as possible.

Mr. Ruderman has always intended to work with whomever needs his assistance to help in this process. In order to start that process, he retained the services of William Floratos, Floratos, Loll & Devine in Santa Ana shortly after his first meeting with his counsel herein. Mr. Floratos was retained for the express purpose of assisting the victims in retrieving funds. Mr. Floratos is an experienced civil litigator. Mr. Ruderman asked Mr. Floratos to inform the investors of what had occurred, and a letter was therefore written to each investor. [Attached as Exhibit 15 is a letter dated April 15, 2009 which Mr. Floratos wrote to each investor.] As the Court can see from this letter, the investors were informed that their investments now had little or no value, that Mr. Ruderman will account to them in detail within 14 days, that Mr. Ruderman will resign, and that Mr. Ruderman would be willing to put any remaining assets under independent control.

At a later time, but as soon as practicable, Mr. Ruderman and Mr. Floratos began to work with the Trustee and the Receiver to provide information that will hopefully enable recovery of substantial sums of money for the investors.

///

# III.

## OBJECTIONS TO PSR

Counsel and Mr. Ruderman have reviewed the PSR and the letter to the Court, and set forth below objections to both.

**PSR**

| **PARAGRAPH** | **OBJECTION** |
|---|---|
| 23 | Mr. Ruderman comments below on a few of the contentions by investors who lost funds as a result of this case.  Mr. Ruderman fully accepts that he is the cause of these losses and realizes that any loss creates a hardship.  However, Mr. Ruderman feels that the PSR exaggerates the financial impact on a few of these investors, and we thus comment on that subject below. |
| 23(a) | Mr. Ruderman concedes that Mr. Noggle lost funds totaling $500,000  that were placed with Mr. Ruderman.  Without discounting the significance of his loss, Mr. Ruderman knows that in addition to investing funds with Mr. Ruderman, Mr. Noggle invested his own funds separately and that those investment (in which Mr. Ruderman took no part) caused him to lose substantially more than the $500,000 that he lost as a result of this case.  These losses were prior to Mr. Noggle meeting Mr. Ruderman.  In addition, Mr. Noggle informed Mr. Ruderman when they first met that he was having marital difficulties before he ever placed any funds with Mr. Ruderman. |
| 23(c) | It is not true that Mr. Ruderman failed to disclose the true reasons for his loss of employment to Mr. Katz.  Mr. Ruderman informed Mr. Katz at a lunch in 1999 that he had |

guaranteed investment returns of a client for whom he had engaged in unsolicited trades.  At no time did Mr. Ruderman pillage Mr. Katz's contacts.  There were only two persons that work at Mr. Katz's company that invested with Mr. Ruderman.    Mr. Ruderman did *not* receive funds for investment from any other of Mr. Katz's contacts.  If Mr. Katz truly invested 75% of his net worth, Mr. Ruderman was not aware of that and would not have recommended that any client invest 75% of their assets.  Although Mr. Katz did obtain a loan from his employer, it was before any fraud was disclosed and thus appears to be for reasons other than the fraud in this case. Mr. Ruderman understands that Mr. Katz sought the loan to purchase a house.  It is not true that Mr. Ruderman has no gambling addiction in that he lost over $5 million in gambling. Mr. Ruderman gambled not because he wished to solicit other investors, but because he was addicted to gambling.  The only person with whom Mr. Ruderman gambled that asked to invest with him was the actor Tobey Maguire, but Mr. Ruderman turned him down as at that time, he was feeling tremendous guilt, remorse and shame.

23(e)     Anthony Brown invested approximately $4 million and pulled out approximately $2.75 million. Mr. Ruderman was contacted by Mr. Brown in early November, 2009.  At that time they spoke on the phone and exchanged text messages.  Mr. Brown told Mr. Ruderman's father that he had financially gotten his financial house in order.

| | | |
|---|---|---|
| 23(g) | | Alan Abramson invested $500,000 with Mr. Ruderman, and the entire sum was lost. Mr. Ruderman understands that Mr. Abramson owns several homes and is one of the largest landlords in the City of Beverly Hills. |

23(h)   It is not true that Mr. Ruderman "gambled for the interaction with high net-worth individuals to perpetuate the Ponzi Scheme." Mr. Ruderman, as explained above, gambled because of an addiction and at no time solicited any of the persons with whom he gambled to invest with him. Two persons with whom Mr. Ruderman gambled were clients of his *before* he gambled with them.

23(j)   Mr. Ruderman was not sanctioned by the SEC but by the New York Stock Exchange. It is also not true that when Mr. Ruderman had his license reinstated, he contacted family members. Family members contacted him as they knew that Mr. Ruderman was investing his own money. Lastly at no time did Mr. Ruderman lie about what had happened in the past. It was public information that he had been sanctioned, and Mr. Ruderman told family members the truth about what happened. The suggestion that Mr. Ruderman started all over again is false. He was sanctioned for something else, not for the type of conduct involved in this case.

39   Mr. Ruderman did stipulate to this enhancement for loss, but argues herein that such a loss figure significantly overstates his culpability.

41   Mr. Ruderman objects to an enhancement pursuant to U.S.S.G. § 2B1.1(b)(9). See legal argument below.

1    Counsel and Mr. Ruderman have reviewed the letter addressed to the Court
2    recommending a prison sentence of 121 months. Counsel will argue in this brief that
3    there are a number of factors which strongly suggest departures and variances and that
4    the actual sentence should be substantially lower than suggested.

5    The probation officer notes that one of the factors to be considered by the Court
6    is the "need to avoid unwarranted sentence disparities among defendants with similar
7    records who have been found guilty of similar conduct. Mr. Ruderman and counsel
8    agree with that statement and suggest based on the information below, that a sentence
9    in the amount suggested by the PSR would involve disparity among defendants in that
10   it would he significantly harsher than sentences of others for similar or more serious
11   conduct.

12   William J. "Boots" Del Baggio was indicted for securities fraud and entered a
13   plea of guilty before the Honorable Charles R. Breyer, United States District Court for
14   the Northern District of California.   The following facts were alleged as to Mr. Del
15   Baggio's conduct: (1) he used doctored brokerage statements to obtain a loan in the
16   sum of $100 million; (2) his conduct caused investors to lose $47 million; (3) he used
17   the money he obtained by his fraudulent conduct to pay off gambling debts, purchase
18   a lavish home in San Jose and purchase a $25 million stake in a hockey team.  News
19   articles stated that Mr. Del Baggio had "previous run-ins with the law."  Mr. Del
20   Baggio was sentenced to a term of 97 months in September 2009. [See Exhibit 20]

21   That case is a serious contrast with the case involving Mr. Ruderman.  In the
22   first place, Mr. Ruderman caused actual losses in the sum of approximately $25.1
23   million. However, of that sum, only $8,658,718.04 was taken for his personal use and
24   an additional $6,572,728.51 was used by him to pay obligations arising from outside
25   business activities.  The total of these is $15,231,446.  The remaining losses were
26   caused by trading losses in authorized securities trades which were undertaken by Mr.
27   Ruderman in good faith and with the intent to make money for his investors. Thus, the
28   contrast between the above case and Mr. Ruderman's case involves a significant

difference in loss to investors and a significant difference in illegal use of funds. Del Baggio used $25 million of the funds he obtained by fraud to purchase a stake in a hockey team and additional amounts to fund a lavish lifestyle. Mr. Ruderman, on the other hand, did not fund a lavish lifestyle at all. During the entire course of his illegal conduct, he acquired no real estate and instead rented an apartment and a beach house for the summer. He likewise acquired no boats or planes. Of the approximately $9 million he used for personal purposes, at least 55% was lost in gambling. Thus, the amount that he used for personal expenses was approximately $3,445,290.20 or about 1/10th of the amount Del Baggio used. [See Exhibit 8]

Won Charlie Yi was sentenced by the Hon. Howard Matz to 84 months. However, the facts are in stark contrast to the conduct of Mr. Ruderman in this case. Yi lulled investors into putting up $20 million on the promise that the funds would be invested in accounts at a New York broker-dealer and that the funds would be invested in publicly traded companies and Regulation S offering. In fact, *none of the funds* were invested as represented. Instead, the funds were deposited in accounts controlled by Yi and others and when investors tried to retrieve the funds, Yi fled the country and has an associate draw out the remaining funds. [Exhibit 37]

Paul Henrie Levy was sentenced by the Hon. Roger T. Benitez, United States District Judge for the Southern District of California to a term of 60 months. Levy was convicted of a scheme to defraud investors of $49 million. [Exhibit 38]

It is respectfully submitted that if the Court considers the unique circumstances of Mr. Ruderman's conduct and how it is quite different from most fraud cases, it would be disparate to sentence him to a term provided for in the Guidelines, which is essentially what the PSR recommends. Unlike most fraud defendants, Mr. Ruderman actually invested most of the funds he received from his clients. In doing so, he was attempting to make substantial returns for them. The government acknowledges this in the Factual Basis it prepared for the Plea Agreement. Unlike most fraud defendants, Mr. Ruderman came forward *before* he had any idea that he was the subject of an

23

investigation.  Unlike most fraud defendants, not only did he come forward, he provided the government with every single record and document that would be needed to prove his guilt.  Unlike most fraud defendants, Mr. Ruderman prepared detailed schedules to aid the investigators in tracing his conduct.  Unlike most fraud defendants, Mr. Ruderman at his own expense hired a civil litigation attorney to assist the bankruptcy trustee and the receive in retrieving funds and providing legal advice and theories for recovery.  Unlike most fraud defendants, Mr. Ruderman continues to this day to cooperate to the fullest extent with the bankruptcy trustee and receiver by providing schedules and information as they request.  Unlike most fraud defendants, Mr. Ruderman has voluntarily entered an excellent program at Beit T'Shuvah in order to receive needed treatment for his addiction to gambling.  Defendants who do not have these factors present in their cases may well deserve a more lengthy prison term and doing less would be disparate.  This is not the case, however, with Mr. Ruderman. Instead, imposing such a severe sentence on him with all these factors present would be disparate.

## IV

### Reference Letters

There are many people that care about and support Mr. Ruderman, and in this section, counsel sets forth letters received from others.

Attached as Exhibit 28 is a painful letter from David Ruderman, Mr. Ruderman's father, who is employed in the investment field as indicated above.  He begins by noting that he and his late wife, Judy, raised Mr. Ruderman from birth and noted that he excelled in school, graduating with high marks, was an outstanding athlete, and a good friend to many."  "He has been an incredibly loyal son and brother going far beyond the norm for his friends and family."  He opines that since Mr. Ruderman began his career with "outstanding results", this "may have put pressure on him to succeed beyond his already high expectations.  I believe that these pressures to succeed created a strong emotional imbalance resulting in his gambling addiction and

1  his crossing of the line into unethical actions in his business." [Counsel recalls vividly
2  meeting with Mr. Ruderman the first time. He had not yet advised any member of his
3  family what he had done, and dreaded the time when he would have to inform his
4  father, for whom he had such tremendous admiration. Counsel knows that doing that
5  was probably one of the most difficult things he had ever done.] His father concludes
6  his letter with a request for leniency on the part of the Court as one would expect from
7  any loving parent. He has continued contact while his son has been at Beit T'Shuvah
8  and notes significant progress in his rehabilitation.

9        Attached as Exhibit 29 is a letter from Lester Boxer Esq., who has known Mr.
10 Ruderman since "the day he was born." "The Bradley Ruderman I have known was
11 a serious, soft spoken UCLA graduate. He was a young adult who was involved in
12 various charities such as The UCLA Foundation, Wilshire Boulevard Temple, Tower
13 Cancer Research, United Jewish Welfare Fund, and Beit T'Shuvah, among others."
14 Mr. Boxer believes that "the seeds leading up to his serious mistakes were planted
15 when his marriage failed, in spite of his efforts to keep the marriage together." He
16 notes that before that Mr. Ruderman had never known failure and emotionally refused
17 to accept it developing an almost obsessive attempt to win back his wife and thus erase
18 his failure.

19       Attached as Exhibit 30 is a letter from Brad Schy, who has known Mr.
20 Ruderman for 25 years and attended UCLA with him. He states "I really admire the
21 way Brad has owned up to the mistakes he has made and is looking to do whatever is
22 needed to rectify the damage."

23       Attached as Exhibit 31 is a letter from Donald S. Hirsch. He and his wife have
24 known Mr. Ruderman's family for 35 to 40 years. He recounts Mr. Ruderman's
25 charitable activities and asks for leniency "in consideration of the good Brad has done
26 in the past and how he has turned his life around in understanding his mistakes and
27 working towards becoming an upstanding citizen to our community."

28

1    Attached as Exhibit 35 is a letter from Bob M. Cohen Esq., who states that he
2  has a long standing relationship with the Ruderman family "and in particular with
3  Brad." He points out that there are two Brad Rudermans, one who came forward and
4  admitted his wrongdoing and who has sincere remorse that "is so very apparent to me
5  and to all the truly know him." This person, he points out, is the person who has done
6  the right thing. The other is the person who is a man with a disease, an addiction to
7  gambling. "His gambling addiction is no less impactful on his conduct as Heroin to an
8  addict." He notes that Mr. Ruderman could have brought in new investors and
9  continued his illegal conduct, but instead came forward, because "he had hit rock
10  bottom." "Brad did not come forward because he knew he would soon be caught. He
11  came forward because he has hit rock bottom and saw himself and what his insidious
12  plague was doing to those around him." Mr. Cohen concludes with the following
13  emotional words: "I believe with every fiber of my being, that Brad is the exception
14  to what the Court routinely sees--he is the real deal and I know that he can and will
15  continue to do as he has promised.".....Brad is truly a person who can and will do
16  greater good post incarceration and I urge the Court to facilitate a result that will
17  sooner rather than later, place him in that position."

18    Attached as Exhibit 36 is a letter from Logan Weiss, Esq., who has been a close
19  friend to Mr. Ruderman for the past 4 years. He portrays Mr. Ruderman as one who
20  is "incredibly caring, open minded, generous, and patient friend to me." Knowing the
21  kind of person Mr. Ruderman is, he found it difficult to accept what he had done. He
22  does not believe that Brad was capable of lying to people and believes that his conduct
23  was in effect destroying him: "Brad wasn't scared of being found out, but rather was
24  so ashamed of himself that he wouldn't really let anyone in." He has noticed the
25  change in Mr. Ruderman. "Although he has and will have significantly less material
26  wealth, in his eyes, he now has and will have so much more of what actually matters."

27    Finally, attached as Exhibit 39 is a letter from Melissa Ruderman, the sister of
28  Mr. Ruderman. She states that Mr. Ruderman is her older brother and that he was a

great supporter to her regarding her problem with drug addiction. "I have had a lot of struggles in my life and Brad was always there for me. In my darkest days, he showed up for me, when others did not. Whether it was therapy, advice or a shoulder to cry on, Brad was there." He also helped her with the severe paid of losing their mother to cancer after an 8 year battle. Ms. Ruderman is an alumni of Beit T' Shuvah and knows full well what an excellent facility it is. She related the progress that her brother has made at Beit T' Shuvah including running the career center and helping kids with addiction. She concludes by stating the following: "To me, Brad has much more value on the 'outside' rather than 'inside'".

## **MEMORANDUM OF LAW IN SUPPORT OF**
## **DEFENDANT'S SENTENCING POSITION**

### **I.**

### **Sentencing Position**

Defendant recommends a sentence of no more than 60 months with 24 of those months in a prison setting and the balance in Beit T. Shuvah and in a home detention program with a requirement of extensive community service.

### **II.**

### **Guidelines Offense Level**

Defendant reaffirms the stipulations in the Plea Agreement and continues to believe that based on the facts stipulated therein, the total adjusted offense level is Level 32, with a sentencing range of 121-151 months. Please see Plea Agreement, pp. 7-8. This, level does not take into consideration the government's agreement in the Plea Agreement to request a 2-level variance for coming forward and cooperating in the investigation. Counsel will argue later that this variance should be greater than 2 levels.

This calculation differs from the calculation in the Pre-Sentencing Investigation Report (PSR) by two levels, represented by the two level upward adjustment pursuant

1    to U.S.S.G. Section 2B1.1(b)(9) based on the conclusion of the probation officer that
2    "Ruderman used sophisticated means to conceal the offense from the victims."

3        As indicated above, Defendant objects to this conclusion, which is not a factual
4    conclusion but a legal conclusion proffered in the PSR.

5        As a matter of fact, the conclusion by the Probation Officer that a two level
6    increase in the Guidelines calculation is appropriate is based solely on the fact that
7    Defendant "prepared and sent to the victims false and fraudulent account statements
8    and IRS Schedule K-1's. PSR, p. 19, Paragraph 41.

9        Defendant disputes that these facts justify a conclusion that the fraud was
10    perpetrated by sophisticated means, because reporting on the gains a victim realizes
11    from a fraudulent investment scheme *requires* false reports to the victim for the scheme
12    to succeed. There is nothing either particularly sophisticated about inserting false
13    numbers reflecting a gain on reports that all investors receive, rather than honestly
14    reporting the losses being realized, or in creating reports on investments that were
15    never actually made to reflect that the money victims thought they were investing was
16    actually invested in order to deceive them.

17        There appear to be two means of determining if the "sophisticated means"
18    upward adjustment applies under the Guidelines. One requires proof that the
19    defendant's fraud was sufficiently more complex that a routine form of the same type
20    of fraud. See U.S.S.G. § 2B1. 1(b)(9); *United States v. Aragbaye*, 234 F.3d 1101, 1108
21    (9th Cir.2000). Here the type of fraud involved is investment securities fraud, which
22    is, by its nature already a complex form of fraud, which routinely requires means at
23    least as sophisticated as the means used by Defendant here - namely to make false
24    written reports to the victims advising them that their investment showed a positive
25    return. Under this rule, the present conduct does not qualify as sophisticated means.

26        The second way to come within the "sophisticated means" provision of the
27    Guidelines relied upon by the Probation Officer is to engage in "especially complex
28    or especially intricate offense conduct." U.S.S.G., § 2B1. 1(b)(9), cmt. n. 8(B). Here,

however, there is nothing complex or intricate about using forms an investor such as the victims would be used to seeing as the report of the (positive or negative) return on their investment, but inserting figures in the form falsely showing a positive return, rather than honestly showing *either* that the investor lost money, or that their money was never invested.

Nor does this scheme itself involve an elaborate or intricate use of shell companies or interlocking business entities. Cf., *Id.*, cmt., n. 8.

Defendant urges this Court to conclude that merely using an ordinary investment related form to falsely report to investor victims does not convert an ordinary securities investment fraud scheme into one involving sophisticated means, and thus the two-level enhancement recommended in the PSR on that basis should not be implemented. Accordingly, it is respectfully argued that a two-level enhancement under this section of the Guidelines is not permitted by current legal authority.

### III.

### Sentencing Argument

Assuming the Total Adjusted Offense level for this case is level 32, with a criminal history category of I (no priors), and a low end of the sentencing range of 121 months, Defendant argues below that based on the facts of this case the Court should find that a variance based on numerous mitigating factors justifies a sentence well below that sentencing range and should include some prison time but also continued treatment for his gambling addiction and home detention with a large amount of community service.

### A.

### Summary of Argument

Specifically, defendant argues below that: (A) under the non-mandatory Guidelines and 18 U.S.C. § 3553(a), the Court is *required* to impose the lowest sentence sufficient to accomplish the goals of sentencing, while considering the factors set forth in the statute; (B) Defendant's crime is mitigated by his mental problems and

severe gambling addiction, which show his need for continued treatment and rehabilitation in the formal program in which he has been participating; (C) comparing the *Guidelines* sentence in this case to sentences in other similar frauds where the Guidelines did not require a lengthy sentence suggests the sentence here should be significantly below the Guidelines sentence; (D) a combination of other factors, including: (*E*) the aberrant or out of character nature of the Defendant's conduct in this cases; (*ii*) Defendant's emotional history and the stress he was under at the time of the offense mitigates his conduct: (*iii*) Defendant's extraordinary acceptance of responsibility show he has already demonstrated he will not reoffend and that he has learned the lesson involved in this case; (*iv*) Defendant's extreme remorse shown by his self sacrificing conduct once he decided, on his own, without contact or persuasion by the Government to report his crime and assist the Government in fully understanding it and tracing the method of the crime and finding the victims; and (*v*) the loss amount set forth in the Guidelines significantly overstates the Defendant's culpability in this case because he was not the sole cause of that level of loss, which was enhanced by fraud perpetrated against Defendant, and which was aggravated by his virtually involuntary gambling losses, and because there is no legitimate correlation between the amount of loss and the culpability of the offender according to the Sentencing Guidelines Commission's own report.

## B.

## **General Principles**

Under the mandatory Guidelines, a downward departure was permitted where the Court found atypical mitigating factors pursuant to the United States Supreme Court decision in *Koon v. United States*, 518 U.S. 81, 95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Each of the mitigating factors discussed in this brief is a sound basis for concluding that the Defendant here would be adequately punished with a sentence significantly below the applicable Guideline range.

1    Even when the Guidelines *were* mandatory, they did not displace the traditional
2    role of the district court in bringing compassion and common sense to the sentencing
3    process. (*United States v. Williams*, 65 F.3d 301, 309-310 (2d Cir. 1995).)

4    Following the decision of the United States Supreme Court in *Booker v. United*
5    *States*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (*Booker*), however, the
6    Ninth Circuit has explicitly sanctioned the use of previously discouraged and/or
7    prohibited grounds for downward departures, in determining the appropriate sentence
8    under the *advisory guidelines* and following the requirements of 18 U.S.C. § 3553(a)..

9        "District courts now also have the discretion to weigh a multitude
10       of mitigating and aggravating factors that existed at the time of mandatory
11       Guidelines sentencing, but were deemed 'not ordinarily relevant,' such as
12       age, education and vocational skills, mental and emotional conditions,
13       employment record, and family ties and responsibilities. *See* U.S.S.G. §
14       5H1.1-6; *see also Koon v. United States,* 518 U.S. 81, 95, 116 S.Ct. 2035,
15       135 L.Ed.2d 392 (1996) ('Discouraged factors ... are those not ordinarily
16       relevant to the determination of whether a sentence should be outside the
17       applicable guideline range. Examples include the defendant's family ties
18       and responsibilities, his or her educational and vocational skills, and his
19       or her military, civic, charitable, or public service record.' (quotations and
20       citations omitted)). Indeed, district courts may even consider factors that
21       were precluded from consideration altogether prior to *Booker,* such as
22       drug and alcohol dependence, lack of guidance as a youth, and personal
23       financial difficulties and economic pressures." *United States v. Ameline*,
24       409 F.3d 1073, 1092 (9th Cir. 2005) (*Ameline*) [Underlining supplied.]

25   Since *Booker*, the United States Supreme Court has held that the Guidelines
26   sentence does not enjoy a presumption that it is the correct or appropriate, or even the
27   reasonable sentence. *Rita v. United States*, – U.S. –, 127 S.Ct. 2456, 2464, 168
28   L.Ed.2d 203 (2007), and see *United States v. Carty*, – F.3d –, 2008 WL 763770 9th Cir.

1  3/24/08) (en banc) [Ninth Circuit will not even apply a presumption of reasonableness
2  to a guideline sentence on appeal.]

3       Moreover, in order to justify or support a "variance" from the Guidelines
4  sentence there is no requirement of "extraordinary" or "exceptional" circumstances.
5  *Gall v. United States*, – U.S. –, 128 S.Ct. 586, 595-596, 169 L.Ed.2d 445 (2007).
6  Finally, contrary to the assumption of numerous circuit court decisions, the guidelines
7  sentences that are not a product of empirical data and study (such as the loss tables)
8  need not be applied, even thought the district court must still determine what the
9  guideline sentence would be before determining what sentence to impose.   See
10  *Kimbrough v. United States*, 128 S.Ct. 558 (2007).

11       In, *Kimbrough v. United States, supra,* 128 S.Ct. at 570 the Supreme Court
12  emphasized the dictate of the statute that district court's must impose the lowest
13  sentence that is sufficient to serve the sentencing goals in Section 3553(a).

14       The statute, as modified by *Booker,* contains an overarching
15       provision instructing district courts to 'impose a sentence sufficient, but
16       not greater than necessary' to accomplish the goals of sentencing,
17       including 'to reflect the seriousness of the offense,' 'to promote respect
18       for the law,' 'to provide just punishment for the offense,' 'to afford
19       adequate deterrence to criminal conduct,' and 'to protect the public from
20       further crimes of the defendant.' 18 U.S.C. § 3553(a) (2000 ed. and Supp.
21       V). * * * In sum, while the statute still requires a court to give respectful
22       consideration to the Guidelines, see *Gall v. United States, ante,* --- U.S.,
23       at ----, ----, 128 S.Ct. 586, at 594, 596, 2007 WL 4292116, *Booker*
24       'permits the court to tailor the sentence in light of other statutory concerns
25       as well,' 543 U.S., at 245-246, 125 S.Ct. 738.

26
27
28  ///

## C.

## Specific Factors Justifying Variance

### 1.

### DEFENDANT'S SEVERE GAMBLING ADDICTION AND HIS PARTICIPATION IN EFFECTIVE TREATMENT AND REHABILITATION AND HIS NEED FOR CONTINUED TREATMENT STRONGLY SUPPORTS A REDUCTION IN THE CUSTODY PORTION OF HIS SENTENCE AND REPLACEMENT OF IT WITH A MEANS OF CONTINUING HIS PROGRAM OF REHABILITATION

The above discussed exhibits clearly establish: (a) Defendant is suffering from a serious mental condition manifesting itself in a gambling addiction; (b) he is receiving treatment for it at the hands of highly qualified professionals with credentials recognized by the California Adult Authority in the treatment of his condition; and © his addiction was a major factor in his commission of the crime to which he pled guilty. See Exhibits 14 (Letter from Carrie Newman), Exhibit 22 (Letter of Drs. Bill Steh, Exhibit 23 Letter from Dr. Timothy W. Fong, MD, PhD., Exhibit 25, Letter from Gregory D. Metzger, and Exhibit 26 Letter from Kathy Marks.

One of the purposes of sentencing is "to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D); *United States v. Martin*, 826 F.Supp. 232 (S.D.N.Y. 1993).

Even under the mandatory Guidelines, various courts had found that it was permissible to depart from the otherwise mandatory guideline sentence to a grant of probation when a custody sentence would interfere with a future or present ongoing program of treatment or counseling that addressed the causes or effects of the Defendant's criminal conduct. See e.g., *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) which held it was permissible to depart down to probation when imprisonment would sever the defendant's access to rehabilitative counseling given the above purpose of sentencing.

1    In *Jones*, the defendant had been convicted of a firearm offense and the district
2    court found that his actions were aberrant and that he would benefit from counseling
3    related to the psychological circumstances that led to his offense.  In upholding the
4    district court's departure down to probation, in part so that the defendant could
5    continue to benefit from counseling available to him at his place of employment, the
6    Circuit Court stated:

7            "In describing Mr. Jones' post-offense conduct, the district court
8        specifically noted Mr. Jones had 'scrupulously followed the conditions
9        of release,' including refraining from contact with Ms. Begay, his
10       estranged wife.  Mr. Jones had 'worked regularly,' supported his three
11       children, and had daily contact and regular consultations with a
12       psychologist, resulting in a 'significant improvement in [Mr. Jones']
13       understanding and attitude.'   The district court found Mr. Jones had
14       changed both his 'attitude and conduct' during his post-arrest release.  In
15       deciding to depart downward, the sentencing court concluded Mr. Jones'
16       post-arrest improvement was 'significant.'

17                                    * * *

18           "The . . . ground for departure supplied by the district court was the
19       negative effect incarceration would have on both the quality and quantity
20       of Mr. Jones' rehabilitative counseling.   The Government contends a
21       defendant's mental and emotional conditions are not ordinarily relevant
22       to sentencing, and that there was 'nothing life-threatening or otherwise
23       exceptional about the deprivation' of counseling services in Mr. Jones'
24       case." *United States v. Jones, supra*, 158 F.3d at 503.

25   The Court there relied on precisely the type of consideration which the Supreme
26   Court in *Booker* held district courts must consider in the wake of its determination that
27   the Guidelines are no longer mandatory.

28

34

1          "... One of the purposes of sentencing is 'to provide the defendant

2        with needed education or vocational training, medical care, or other

3        correctional treatment in the most effective manner.'   18 U.S.C. §

4        3553(a)(2)(D)." *Id.*, at 503.

5     As noted above, the Supreme Court held in *Booker* that sentencing courts

6 exercising discretion as to whether to sentence below the advisory Guideline range,

7 must now consider the factors set out in Section 3553(a). Applying this analysis to the

8 present case, this Court is urged to grant Defendant leniency for precisely the same

9 reasons that motivated the court in *Jones* to do so - to enable Defendant to continue

10 with needed are and other correctional treatment which he is now receiving.

11     The Court in *Jones* concluded:

12          "... The sentencing court also found incarceration would sever Mr.

13        Jones' connection to a counselor the court determined to be 'beneficial'

14        to him.  *Id.* The court concluded the 'unusual situation' of Mr. Jones'

15        employment provided the 'very best place' for him to receive

16        rehabilitative counseling.... Under these circumstances, we conclude the

17        district court did not abuse its discretion when it considered access to

18        rehabilitative counseling as one factor supporting its decision to depart

19        downward." *Id.*, at 503-504.

20     Even under the Guidelines, there was a recognition that an infirm defendant

21 might benefit from home confinement in place of incarceration under certain

22 circumstances. (Cf., U.S.S.G. §5H1.1 [Age may be considered, for example, when a

23 defendant is "elderly and infirm and where a form of punishment such as home

24 confinement might be equally efficient as and less costly than incarceration." §5H1.1

25 (citing *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).)

26     Moreover, the Guidelines themselves recognized that mental and emotional

27 conditions are specific offender characteristics (U.S.S.G. § 5H1.3) and under *Booker*

28

1  such specific offender characteristics must be considered in the district court's exercise
2  of discretion in sentencing.

3        The Ninth Circuit had also recognized that promoting post-conviction
4  rehabilitation was a valid reason for a mitigated sentence even prior to *Booker*. This
5  in *United States v. Sanchez Rodriguez*, 161 F.3d 556 (9ᵗʰ Cir. 1998) (en banc) the Ninth
6  Circuit overruled several prior Ninth Circuit cases forbidding departure on particular
7  grounds, including post-offense rehabilitation, on the basis of *Koon v. United States*,
8  *supra*, 518 U.S. 81, 98-100, 116 S.Ct. 2035, 135 L.Ed.2d 392.  Citing 18 U.S.C.
9  §3882(a) for the proposition that "imprisonment is not an effective way to promote .
10 . . rehabilitation..." and citing *Application Note 6 to Commentary to* U.S.S.G. §
11 5C1.1(d)(2) for the proposition that rehabilitation is a basis for departing from custody
12 to home confinement in case of a split sentence, the decision in *Sanchez-Rodriguez*
13 was a precursor to post-*Booker* sentencing that focused on precisely the factors that the
14 Court now <u>must</u> consider in exercising its discretion to impose a just sentence.

15       Since the Supreme Court decided *Gall v. United States,* --- U.S. ----, 128 S.Ct.
16 586, 597, 169 L.Ed.2d 445 (2007) and the Ninth Circuit decided *United States v.*
17 *Carty*, 520 F.3d 984, 993 (9th Cir.2008) (en banc), the Ninth Circuit has affirmed
18 drastic reductions from the applicable Sentencing Guidelines ranges in cases involving
19 this category of mitigation.   See e.g., *United States v. Whitehead*, 532 F.3d 991 (9th
20 Cir. 2008) [Court affirmed a sentence of probation, community service and restitution
21 despite a Guidelines range of 41 to 51 months and a loss of over $1 million]; *United*
22 *States v. Ruff*, 535 F.3d 999, 1001-1002 [Defendant was required to spend 12 months
23 and one day of confinement in a residential center, where he could receive counseling
24 for his gambling addiction, participate in work release to help pay restitution and have
25 periodic visitations with his son as BOP might approve.]; and see *United States v.*
26 *Grant*, 172 F.3d 59, 1999 WL 65109 (9th Cir. 1999) (Table Decision Unpublished)
27 [affirming where the "district court recognized its discretion to depart downward"
28 because of a gambling addiction].

36

1   Clearly, the law permits this Court to consider as a mitigating factor pursuant to
2   Section 3553(a), Defendant's mental and emotional condition, including his well
3   documented gambling condition, and further requires this Court to consider whether
4   some form of treatment or rehabilitation counseling and treatment would benefit him
5   in light of this condition.

6       Finally, because in the present case, Mr. Ruderman is currently being treated by
7   a reputable treatment program and because he is not only in continuing need of such
8   treatment, but he is affirmatively contributing to his community and his fellow sufferer
9   as a part of his involvement with the program, this Court is urged to exercise its
10  discretion to reduce the defendant's custody sentence significantly in order to allow
11  for his continuation in his program of ongoing rehabilitation for one of the root causes
12  of his criminal conduct. As such, a sentence that includes at least two years continued
13  treatment and participation in the gambling addiction program he is currently enrolled
14  in, in lieu of a like period of custody, would be appropriate.

15                                          2.

16
17  **PRINCIPLES OF DISPARITY OF SENTENCING TOGETHER
    WITH THE FACT THAT THE GUIDELINES RELIANCE ON THE
18  LOSS AMOUNT AS A SURROGATE FOR CULPABILITY IS NOT
    A   VALID   BASIS   FOR   DETERMINING   EITHER   THE
19  DEFENDANT'S   CULPABILITY   OR   THE   NEED   FOR   A
    PARTICULAR LEVEL OF PUNISHMENT SUPPORT A FAR
20  LOWER CUSTODY SENTENCED IN THIS CASE THAN CALLED
    FOR UNDER THE NOW ADVISORY GUIDELINES**

21      As discussed above, there is a recent example of a case in which a crime
22  bearing some similarities to the present case merited a substantially lower sentence
23  than the one recommended in the PSR. Please see Exhibit 20.

24      In addition, when the subject of "disparity" is considered, it is no longer clear
25  that the Guidelines are an appropriate place to begin or end the inquiry. What is clear,
26  however, is that the Guidelines Commission itself has publically admitted that in white
27  collar fraud crime cases, the Guidelines are neither justified by experience, or science.
28  That is to say, although the Guidelines assume that there is a correlation between loss

1  and culpability of the offender, this was never established by the research or
2  experience relied on by the Commission. Moreover, there is no evidence that the
3  drastic spike in custody sentences (as opposed to probation sentences) and the drastic
4  increase in the length of sentences for white collar crimes that was ushered in by the
5  mandatory Guidelines, was either justified or necessary to punish while collar
6  offenders.

7      However, according to the United States Sentencing Commission's own reports,
8  the guidelines manual, and reliable historical sources, such as Justice Breyer (who was
9  the Chairman of the Guidelines Commission, and the author of the majority opinion
10  in *Booker v. United States*, *supra*, 543 U.S. 220), the Guidelines do not always address
11  these factors in white collar crime cases.[7]  (Please see also *United States v. Hunt*, –
12  F.3d —, 2006 WL 2285715 (11th Cir. Aug. 10, 2006); *United States v. Grier*, 499 F.3d
13  558 (3rd Cir. 2006); *United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006); *United*
14  *States v. Jimenez-Beltre*, 440 F.3d 514 (1st Cir. 2006); *United States v. Jaber*, 362
15  F.Supp.2d 365, 370-376 (D. Mass 2005); *United States v. Huerta-Rodriguez*, 355
16  F.Supp.2d 1019, 1025 (D. Neb. 2005); *United States v. Myers*, 353 F.Supp.2d 1026
17  (S.D. Iowa 2005); *United States v. Ranum*, 353 F.Supp.2d 984 (E.D. Wis. 2005).

18      Contrary to the assumption that sentence within the Guidelines sentence already
19  includes consideration of all of the other Section 3553(a) factors, it has been
20  recognized that the guidelines are "inescapably generalizations" which "say little about
21  'the history and characteristics of the defendant'" and they even "prohibit
22  consideration of certain individualized factors" and "discourage" consideration of
23  others.  (Please see *United States v. Jimenez-Beltre*, *supra*, 440 F.3d 514, 524, 525-
24  527, 528 & n. 11 (Lipez, J., dissenting).[8]

25

26      [7] Please see Paul J. Hofer, *Immediate and Long-Term Effects of United States*
    *v. Booker; More Discretion, More Disparity, or Better Reasoned Sentences?*, 38 Ariz.
27  St. L. J. 425, 453-454 (2006).

28      [8] See also *United States v. Navedo-Concepcion*, 450 F.3d 54, 60 (1st Cir. 2006)
    (Torruella, J., dissenting) ["I am concerned that we are . . . regressing to the same
    (continued...)

Moreover, although the Guidelines Commission has proclaimed that "in developing the initial set of guidelines and refining them throughout the ensuing years" it "considered the factors listed in section 3553(a), cited with approval in *Booker*,"[9] historical sources tell the opposite story. In fact, although Congress directed the Commission to consider all four statutory purposes,[10] the original Commissioners "considered" only "just desserts" and "crime control" and then expressly abandoned those two purposes when they could not agree which one should control. (U.S. Sentencing Guidelines, Ch. 1, Pt. A(3) (1988).) The Guidelines solved this "philosophical dilemma" by adopting an "empirical approach that uses data estimating the existing system as a starting point" (*Id*), but did not actually follow that approach either. In the Commission's own report, however, the Commission itself reports that instead, they implemented sentences "significantly more severe than past practice" for "the most frequently sentenced offenses in the federal courts" including for fraud. (See U.S. Sentencing Commission, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* (1987); and U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of the Sentencing Reform Act* at 47 (2004) (hereafter "Fifteen Year Report") available at http://www.ussc.gov/15year.htm.)

In 1999 the Commission staff reported that the average time served under the Guidelines had doubled since the guidelines inception and noted evidence that lengthy prison sentences were being handed out to offenders with little risk of recidivism, and without deterrent value. (See Paul J. Hofer & Courtney Semisch, *Examining Changes*

---

[8](...continued)
sentencing posture we assumed before the Supreme Court decided *Booker* . . . [I do not] believe this is what the Supreme Court had in mind when it struck down the mandatory Guidelines regime."]

[9] Prepared Testimony of Judge Ricardo H. Hinojosa Before the Subcommittee on Crime, Terrorism and Homeland Security (Feb. 10, 2005) available at http://www.ussc.gov/Blakely/bookertestimony.pdf (hereafter "2/10/05 Commission Testimony").

[10] See S.Rep. No. 98-225, 98th Cong., 1st Sess. 59, 77 (1984).

1  *in Federal Sentence Severity, 1980-1998*, 12 Fed. Sent. Rep. 12, 1999 WL 1458615
2  (July/August 1999).

3          Although the testimony of the Chair of the Commission claimed the guidelines
4  are a "mirror image" of 18 U.S.C. § 3553(a), just three months earlier, the
5  Commission's *15 Year Report* reported that much of the ever-increasing severity of the
6  guidelines was due to real or perceived <u>political pressure</u>, and admitted it *still* had <u>not</u>
7  <u>determined whether the guidelines' increased severity achieves sentencing purposes,</u>
8  but suggested that penalties *could* be reduced to better achieve sentencing purposes
9  and reduce prison overcrowding.  (Please see <u>Fifteen Year Report</u> at 77, 137-140,
10 Executive Summary at vi, xvii.)

11         In 2003, the bi-partisan ABA Justice Kennedy Commission published its report
12 (http://abanet.org/media/kencomm/summaryrec.pdf), which called on the Commission
13 to reduce guidelines sentences because they are unjust, ineffective, and inefficient.

14         In addition, the entire approach of the Commission was to increase sentences for
15 economic (i.e., fraud) and particularly white collar economic crimes over what they
16 had been prior.  It increased sentences above past practice with the stated goal of
17 providing a "short but definite period of confinement for a larger proportion of these
18 'white collar' cases in the belief that this would 'ensure proportionate punishment and
19 . . . achieve deterrence.' " (<u>15 Year Report</u>, *supra*.)

20         The 15 Year Report stated that "the percentage of offenders receiving simple
21 probation has been cut in half under the guidelines." (<u>15 Year Report</u>, p. 42.)  The
22 term "simple probation" was used to mean probation with no custody imposed as a
23 condition of probation.  In fact, the report showed that "between fiscal year 1988 and
24 1991, the first four years of guidelines implementation, the use of simple probation was
25 cut by half.  In 1987, 29% of offenders received sentences of probation, while only 14
26 percent did in 1991." (*Id*., at 43).  In addition, where prison was imposed the "average
27 prison time for federal offenders more than doubled after implementation of the
28 guidelines." (*Id*, at 46.)

It can be seen that: (1) the Guidelines did not accurately reflect prior sentencing practice; (2) without justification dramatically increased the number of fraud cases in which custody was imposed, and dramatically increased the length of custody sentences in all fraud cases, also without any justification linked to the Section 3553(a) sentencing factors; (3) took into account virtually no personal characteristics or the defendant's history as mandated by the statute, but, in fact, prohibited sentencing courts from imposing lower sentences by departing downward on the basis of such factors; and thus are not a guarantee that any sentence within the Guidelines sentence is a "reasonable" sentence under *Booker*.

Now that the Guidelines are no longer mandatory or even a presumptively correct sentence at the District Court level (See *Rita*, 127 S.Ct. at 2464-65), this Court may look to sentences in pre-Guideline cases for how similarly situated defendants convicted in serious first time fraud prosecutions were sentenced.

For example, please see *United States v. Wellington,* 754 F.2d 1457 (9th Cir. 1985) [major land fraud scheme; after jury trial, Wellington, who had four prior convictions and masterminded the scheme sentenced to three years, all but 6 months of Defendant Utz's sentence suspended, placed on 3 years probation]; *United States v. Patel*, 762 F.2d 784 (9th Cir. 1985) [fraudulent scheme resulting in penalties and fines of over $9 million, individual defendant received one year in jail and five years probation.]; *United States v. Lane*, 765 F.2d 1376 (9th Cir. 1985) [complex scheme to defraud United States Government involving phony companies, and skimming from government contracts, Defendant sentenced to five years probation, and to repay one half of the money taken, and perform community service]; *United States v. Stozek*, 783 F.2d 891 (9th Cir. 1985) [Real estate developer and banker worked together to defraud bank of at least $900,000 through a bad check scheme, both sentenced to five years probation, restitution and 2800 hours of community service.]; *United States v. Whitney*, 785 F.2d 824 (9th Cir. 1986) [Defendant pled guilty to fraud, sentenced to probation and six months in custody.].

1      If the artificially draconian sentence ranges called for in the Guidelines are put

2  aside, it is clear that defendants who pled guilty to similar offenses often received

3  probation sentences. Those sentences for similar crimes are an equally valid basis for

4  considering whether the sentence being imposed creates a disparity among similarly

5  situated defendants, and whether the sentence is the lowest sentence necessary to

6  punish the defendant considering the statutory goals of sentencing and the sentencing

7  factors. (Cf, Section 3553(a); *Kimbrough v. United States*.)

8      Moreover, since this Court is free to impose any sentence if finds to be

9  reasonable, without any presumption that the sentence should be based on or

10 comparable to the appropriate Guidelines sentence (Cf., *Rita v. United States*, *supra*,

11 – U.S. –, 127 S.Ct. 2456, 2464, 75 USLW 4471), it need not make any determination

12 regarding whether or not any mitigating factors identified either in the PSR Cover

13 Letter, or here, would be sufficient alone or in combination with other mitigating

14 factors to justify a <u>Departure</u> under the Guidelines, in order to impose the reasonable

15 sentence suggested here.

16

17
                                3.

18
A COMBINATION OF MITIGATING FACTORS, CONSIDERED
SEPARATELY OR TOGETHER MILITATE IN FAVOR OF A

19 SIGNIFICANTLY LOWER SENTENCE THAN THE GUIDELINES
SENTENCE

20     The above facts (i.e., the need for continued rehabilitation and treatment,

21 defendant's substantial cooperation, and a comparison to other similar major fraud

22 sentences where, as here, the Guidelines are not mandatory) all support a below

23 Guidelines sentence in this case.    Below Defendant argues that this Court is

24 empowered to consider these and additional factors either individually, or in

25 combination with one another in determining to grant him a "variance" below the

26 Guideline sentence.

27

28 ///

1

**(a)**

2

*The Criminal Conduct in this Case (even though it was*

3

*carried out by a series of acts over time) was aberrant*

4    While the concept of an "aberration" may be neatly applied to a single act or

5 event, the law of sentencing under the Guidelines allowed courts to consider whether

6 a person like Defendant who had never previously been convicted of any crime, should

7 be a candidate for a mitigated sentence because his involvement in a criminal course

8 of conduct was aberrational.  Defendant submits that in this case, his involvement in

9 a fraud was indeed an aberration.

10    An "aberration" is defined as "the act of departing from the right, normal, or

11 usual course."[11]  Clearly, however, to be an aberration that qualifies for a lower

12 sentence, a defendant's conduct must fit into the type of conduct that departs from his

13 "normal or usual" course, (not merely conduct that departs from the "right" course.)

14    Just as clearly, the personal history of Bradley Lewis Ruderman is proof that the

15 course of conduct that led him to this Courtroom to be sentenced for a crime of fraud

16 was a departure from his normal and usual course.

17    Defendant was a law abiding citizen serving his clients on Wall Street for nearly

18 23 years. (See "Background" above).

19    According to those who knew him best, he has always been involved in

20 charitable activities.  Exhibit 31, Letter from Daniel Hirsch, he always strived for

21 excellence, both in school at U.C.L.A., and in his family and professional life.

22    The personal history of the Defendant shows that he is a giving (not a taking)

23 person, who has never previously been selfish nor taken money or property from

24

25

26

27

28
---
[11]  Random House Dictionary of the English Language (2d Ed. Unabridged)
(1987). [First listed definition for "aberration."]

43

1  others.[12]  In this way, the offense conduct here is clearly "out of character" for this
2  defendant.

3      Another related issue is: What factor or factors came together to result in
4  Defendant engaging in conduct that is so clearly against his nature?  As discussed
5  above, Defendant was a perfectionist, and when his marriage failed, he became
6  desperate to right the situation. Exhibit 29, Letter from Lester Boxer, Esq., ["almost
7  obsessive attempt to win wife back" to erase his failure].  At the time he was engaging
8  in the criminal conduct in this case, his gambling addiction flowered, and he was
9  acting in a compulsive and desperate manner in order to "fix" his life.  The attached
10  Declarations and statements of those who have worked with, evaluated and tested Mr.
11  Ruderman in connection with his gambling problem attest to the fact that he was not
12  acting according to his normal moral compass, nor was he acting in a manner that can
13  be considered to be entirely rational, but rather was suffering from a compulsion to win
14  to right the situation he was in.

15      Moreover, once he was confronted by his own conduct, he immediately
16  determined to make a clean breast of the situation and without being contacted by the
17  Government, he worked tirelessly to create a comprehensive roadmap of his crimes,
18  giving dates, dollar figures, and activities so that what he did could be easily
19  determined and confirmed.

20      Defendant submits that this is the conduct of a normally law abiding and moral
21  good person, who engaged in dishonesty *because* of other emotional or mental health
22  pressures, and not because it was his nature to steal money from his fellow man.  Once
23  Mr. Ruderman recognized what he was doing, his natural honest personality took over
24  and he has worked tirelessly almost non-stop to correct his improper conduct.

25
26
27

28      [12]  The one time he was fined by the Stock Exchange, it was for making trades
on behalf of his clients without adequate authority, not for cheating them, for self-
dealing, or for any fraudulent conduct.

1    Finally, unlike a repeat thief, Mr. Ruderman has demonstrated extraordinary
2  remorse for his crimes to the extent that he nearly took his own life out of shame and
3  guilt.

4    Again, this in not the conduct of a person to whom theft comes naturally, or to
5  one who has been dishonestly taking the valuables of others for his life. Rather, this
6  is the conduct of a person who has been a law abiding, honest person, who for what are
7  not understandable reasons, engaged in an aberrational course of conduct that was
8  completely against his true nature.

9    Case law under the Guidelines, from the Ninth Circuit that allowed a downward
10  departure in this type of case for "aberrant conduct" where the Court concludes that the
11  conduct was: (a) out of character for the Defendant; and (b) a course of conduct that
12  was the result of pressures working on the Defendant to do something he would not
13  ordinarily do. For example, in *United States v. Working*, 224 F.3d 1093 (9th Cir. 2000)
14  (en banc) [among the factors that justified a downward departure were psychological
15  disorder (depression); extreme pressure; aberrant nature of the crime; motivation of the
16  defendant was not greed.] This reasoning is consistent with the post-*Booker* rule cited
17  above in *Ameline*. See 409 F.3d at 1092.

18    As is shown by the factual discussion above, each of these factors is also present
19  in this case to some degree. Defendant was not motivated by personal greed, but by
20  a desire to "fix" his situation, driven by a compulsive mental condition.

21    The availability of a downward departure, prior to *Booker*, where, as here there
22  is an aberrational series of related criminal conduct was explicitly approved in *United*
23  *States v. Lam*, 20 F.3d 999, 1003-1005 (9th Cir. 1994) [view that must be single event
24  rejected]; *United States v. Fairless*, 975 F.2d 664 (9th Cir. 1992) [departure in bank
25  robbery case in light of depression, first offense, loss of job, shock of family and
26  friends]; *United States v. Morales,* 972 F.2d 1007, 1011 (9th Cir. 1993) [aberrant
27  conduct departure allowed where no criminal history]; *United States v. Tokai*, 941 F.2d
28  738, 744 (9th Cir. 1991) [multiple acts over 6-week period, involving bribing INS

45

1  official to get green card, still constitute a single act of aberrant conduct where
2  defendant did not obtain pecuniary gain from crime]; *United States v. Dickey*, 924 F.2d
3  836 (9th Cir. 1991) [first offender bank theft based on $80K bank error]; *United States*
4  *v. Garcia*, 182 F.3d 1165, 1176 (10th Cir. 1999) [careful planning does not preclude
5  first offender from this departure, correct focus is not the aberrational character of the
6  conduct, not on the number of discrete acts undertaken by the defendant]; *United*
7  *States v. Jones*, 158 F.3d 492 (10th Cir. 1998) [35 year old was law abiding until his
8  marriage disintegrated].

9      Defendants  personal history demonstrates that acting at the expense of others
10  (i.e., the victims) was a departure from Defendant's normal or usual course of conduct.
11  In light of *Booker*, this Court is no longer required to limit its reasons for reducing a
12  sentence from the Guideline sentence to those reasons that would justify a "departure"
13  under pre-*Booker* law.  Rather, this Court is now empowered to reduce a Defendant's
14  sentence below that mandated under the Guidelines, based on any factor which appears
15  to be mitigating, which will render the Court's exercise of its discretion to be
16  reasonable.

17      Here, Defendant urges this Court to conclude that the aberrant nature of
18  Defendant's conduct is a reasonable basis for imposing a sentence below the applicable
19  Guideline range.

20                              **(b)**
21              ***Defendant's mental and emotional history, and the stress***
22               ***he was subjected to supports a mitigated sentence.***

23      The Guidelines themselves recognized that mental and emotional conditions are
24  specific offender characteristics (U.S.S.G. § § 5H1.3) and under *Booker* such specific
25  offender characteristics must be considered in the district court's exercise of discretion
26  in sentencing.  *Ameline* explicitly approved a lower sentence based on such factors.
27      The Ninth Circuit had also recognized that promoting post-conviction
28  rehabilitation was a valid reason for a mitigated sentence even prior to *Booker*.  Thus

1  in *United States v. Sanchez Rodriguez*, 161 F.3d 556 (9th Cir. 1998) (en banc) the Ninth
2  Circuit overruled several prior Ninth Circuit cases forbidding departure on particular
3  grounds, including post-offense rehabilitation, on the basis of *Koon v. United States*,
4  *supra*, 518 U.S. 81, 98-100, 116 S.Ct. 2035, 135 L.Ed.2d 392.  Citing 18 U.S.C.
5  §3882(a) for the proposition that "imprisonment is not an effective way to promote .
6  . . rehabilitation..." and citing *Application Note 6 to Commentary to* U.S.S.G. § §
7  5C1.1(d)(2) for the proposition that rehabilitation is a basis for departing from custody
8  to home confinement.  The decision in *Sanchez-Rodriguez* was a precursor to post-
9  *Booker* sentencing that focused on precisely the factors that the Court now
10 <u>must</u> consider in exercising its discretion to impose a just sentence.

11      In addition to his gambling problems, the attached Exhibits demonstrate that
12 Defendant has suffered enormous emotional pain resulting from other factors, such as
13 the failure of his marriage, and his psychological need to be a perfect son in the eyes
14 of his parents. See Exhibit 28, <u>Letter from David Ruderman</u>.

15      In this case the Court is urged to conclude that Defendant Ruderman would
16 benefit most from such a sentence that would permit him to continue to receive the
17 type of mental health care he needs.  In addition, here, just as in *Jones*, incarcerating
18 Defendant would not serve any rehabilitative purpose but would possibly damage or
19 destroy what remains of his sense of self-worth.

20                              (c)

21          ***Defendant has shown an extraordinary acceptance of***
22          ***responsibility.***

23      It is clear that Defendant has fully accepted responsibility for the conduct he
24 engaged in which was fraudulent. As with the other bases Defendant offers for this
25 Court to exercise its discretion to impose a sentence well below the Guideline range,
26 there is pre-existing authority that this type of consideration was a valid basis for a
27 downward departure when the Guidelines were mandatory. Thus in *United States v.*
28 *Brown*, 985 F.2d 478, 482-483 (9th Cir. 1993) the Ninth Circuit concluded that

1 departure was permissible where the two point reduction under Section 3E1.1(a) did
2 not adequately reflect the full extent of the Defendant's acceptance of responsibility.

3     Similarly, in *United States v. Miller*, 991 F.2d 552 (9th Cir. 1993) and *United*
4 *States v. Farrier*, 948 F.2d 1125, 1127 (9th Cir. 1991) the Court held extraordinary
5 acceptance of responsibility warranted a lower sentence.

6     Here, in view of the fact that Mr. Ruderman unhesitating and substantial
7 acceptance of responsibility has already led the Government to concede that a two
8 level variance would be appropriate in this case.

9     While that is appreciated, Defendant submits that a more substantial variance is
10 also justified in view of the detailed work he did to present the incriminating facts of
11 his case to the Government, and in view of the fact that this conduct followed a moral
12 epiphany rather than a visit from the FBI or other law enforcement agency.

13     In *this* case the Defendant virtually made the case against himself and spent
14 upwards of 40 hours documenting it, with bank statements and other records he
15 personally gathered in order to put all the pieces together to save the Government the
16 time or trouble.   It had been acknowledged by the Government that this work saved
17 the government a substantial amount of time and work otherwise required to make this
18 case, and it is clear that saving the Government resources in these circumstances, even
19 before being contacted by the Government, is rare indeed.

20     Moreover, Defendant did not merely provide documentation to the Government.
21 He also met for hours with the prosecutors and agents, <u>without any proffer agreement</u>
22 <u>or immunity letter</u>, which is ordinary in pre-indictment meetings in this District, and
23 answered truthfully and completely, all questions by the Government to render his
24 documentary report meaningful and helpful in locating victims and in tracing funds.
25 He continues to be an integral part of the Government's efforts to collect funds to
26 repay the victims.

27     This, combined with Defendant's cooperation, discussed separately below,
28 merits a substantial variance below the Guidelines sentencing range.

### (d)

### *Defendant has shown extreme remorse.*

For reasons similar to the previous mitigating factor (extraordinary acceptance of responsibility), the Defendant in this case is also entitled to have the Court consider his extreme remorse. The exhibits to this brief establish that Defendant was on the verge of suicide, even to the extent of attempting to purchase a firearm to kill himself, out of guilt and because of the way he had victimized his fellow human beings, and disgraced himself and his family.

In *United States v. Fagan*, 162 F.3d 1280, 1284-85 (10th Cir. 1998) and *United States v. Jarozenko*, 92 F.3d 486 (7th Cir. 1996) the Courts held that even where acceptance of responsibility was fully considered and adjustment for it  made, where the defendant shows remorse to an exceptional degree, the guidelines did not forbid departure, and it could form a valid basis for a lower sentence.

In this circumstance, his extreme remorse justifies a mitigated sentence.

### (e)

### *The loss was not caused solely by Defendant's conduct*
### *(i.e., there were multiple causes of that loss).*

Federal Courts have recognized when applying the Guidelines in fraud cases that at times the loss calculation can overstate the culpability of the offender. See e.g., *United States v. Rostoff*, 53 F.3d 398 (1st Cir. 1995); *United States v. Gregorio*, 956 F.2d 341 (1st Cir. 1992), *United States v. Arutunoff*, 1 F.3d 1112 (10th Cir. 1993). Furthermore, as noted above, in *Kimbrough*, the Supreme Court observed that absent empirical data justifying the assumptions underlying the Guidelines sentences, the Court may very well find that those sentences are not justified.[13]

---

[13] E.g., there is no study or other empirical data demonstrating that a theft crime involving more loss is a more serious crime, or that a certain amount of loss equals, or should equal a certain sentence. The Guidelines Commission simply assumed that to be true when it arbitrarily selected the number of offense levels it correlated to graduated loss amounts. And these levels have been changed by the Commission in response to public or political pressure totally unrelated to any kind of rational study

(continued...)

49

In the present case, the Defendant was not personally responsible for the entire loss attributable to the scheme charged in the Indictment. In addition, he did not become wealthy, or lead a lavish lifestyle on the proceeds of this fraud.

While there is a significant loss in this case, as outlined in detail above, some of that loss was due to bona fide investments which simply were not profitable in the market conditions that prevailed at the time and some of the losses were the result of a fraud perpetrated upon Mr. Ruderman in the China Tel investment company fraud, discussed above. Thus although the stipulated loss as calculated under the Guidelines is high, the actual effective loss that this Court should consider under Section 3553(a), and its power to depart where, as here the Guidelines loss figure overstates the defendant's culpability is $15,231.46, which equates to a loss upward adjustment of 20 rather than 22 levels reflected in the PSR, and although the PSR is accurate as to the guideline loss, Defendant submits that given the circumstances in this case, the loss figure in the PSR substantially overstates his actual culpability.

As such, this constitutes yet another reason for this Court to impose a sentence lower than that minimum sentence that would have been mandatory under the Guidelines when they were mandatory.

### (f)
### *The combination of factors justifies a substantial reduced sentence, even if alone none would.*

The United States Supreme Court has recognized that a lower sentence can be based on a combination of mitigating factors, where the district court concludes that individually, no single factor justifies that lower sentence. See *Koon v. United States*, *supra*, 518 U.S. 81; *United States v. Rivera*, 994 F.2d 942 (1st Cir. 1993); *United States* v. *B. Roe*, *supra*, 976 F.2d 1216, 1218.

---

[13](...continued)
or data.

50

1    Recently, in *United States v. Whitehead*, *supra*, the Ninth Circuit affirmed this
2    multi-factor approach to reduce a 41-51 month sentence to probation.

3    Another "combination of factors" case is *United States v. Menyweather*, 431
4    F.3d 692 (9th Cir. 2005) where the Ninth Circuit upheld a probation sentence [with 40
5    days in a "jail-type" setting] which was in the range 8 levels below the applicable
6    Guideline range.  The facts of *Menyweather* that supported a higher sentence included
7    her three year program of theft from the United States Government while an employee
8    of the United States Attorneys office, her fraudulent use of Government and other
9    credit cards, loss in the amount of at least $435,000, and a series of acts to cover up her
10   theft and avoid detection.[14] Despite these facts, the Ninth Circuit upheld the probation
11   sentence under the standard of *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738,
12   160 L.Ed.2d 621 (2005).

13   "Before *Booker,* we reviewed de novo whether a departure was
14   proper under the constraints set forth in the United States Sentencing
15   Guidelines ('U.S.S.G.' or 'Guidelines').  *See* 18 U.S.C. § 3742(e).  <u>Now,</u>
16   <u>instead, we review the district court's sentence for 'reasonableness.'</u>
17   *Booker,* 125 S.Ct. at 765- 66.  Also, whereas the district court was
18   previously *required* to sentence according to the Guidelines, <u>the</u>
19   <u>Guidelines are now 'effectively advisory.'</u> *Id.* at 757."  *United States v.*
20   *Menyweather*, *supra*, 431 F.3d at 694.

21   The Circuit Court there also endorsed imposing a lower sentence, based on
22   mitigating factors not identified in the PSR, and found such mitigating factors to be a
23   valid basis for "imposing a sentence lower than the sentence recommended in the
24   PSR."  (*Id.*)

25
26
27
28   [14] "During this period, she used her government credit card and other peoples's
     cards for almost three years to steal over $435,000--that the government has been able
     to verify--and faked certifications and computer entries to cover up her thefts.  Yet she
     has not been sent to prison."  *Id.*, at p. 702, Dissenting Op., Kleinfeld, J.

1   As previously stated, the Court in *Booker* and *Menyweather* emphasized the
2   ability of the district court to fashion a sentence that took into consideration the factors
3   listed in 18 U.S.C. § 3553(a), including "(1) the nature and circumstances of the
4   offense and the history and characteristics of the defendant; (2) the need for the
5   sentence imposed--(A) to reflect the seriousness of the offense, to promote respect for
6   the law, and to provide just punishment for the offense; (B) to afford adequate
7   deterrence to criminal conduct; © to protect the public from further crimes of the
8   defendant; and (D) to provide the defendant with needed educational or vocational
9   training."

10   In addition, as the Supreme Court pointed out in *Booker,* § 3553(a) makes the
11   Guidelines sentencing range a required consideration, *see* § 3553(a)(4), but "permits
12   the court to tailor the sentence in light of other statutory concerns as well." *Booker,*
13   125 S.Ct. at 757; *see also id.* at 767

14   In *Menyweather*, the Ninth Circuit made it clear that <u>even if a Defendant does</u>
15   <u>not qualify for a downward departure under the Guidelines, the District Court is still</u>
16   <u>permitted to impose any sentence that is not unreasonable.</u>

17   "Alternatively, even if we were to accept the government's
18   argument that the district court erred by departing on this basis under the
19   Guidelines, we can say confidently that any error would be harmless to
20   the government in this case. * * * [¶]  In the 'broader appraisal,' [FN7]
21   available to district courts after *Booker,* courts can justify consideration
22   of family responsibilities, an aspect of the defendant's 'history and
23   characteristics,' 18 U.S.C. § 3553(a)(1), for reasons extending beyond the
24   Guidelines. 'District courts now ... have the discretion to weigh a
25   multitude of mitigating and aggravating factors that existed at the time of
26   mandatory Guidelines sentencing, but were deemed "not ordinarily
27   relevant," such as age, education and vocational skills, mental and
28   emotional conditions, employment record, and family ties and

1  responsibilities.'  *United States v. Ameline,* 409 F.3d 1073, 1093 (9th
2  Cir.2005) (en banc) (Wardlaw, J., concurring in part and dissenting in
3  part) (emphasis added).

4       FN7. *United States v. Gorsuch,* 404 F.3d 543, 548 (1st
5       Cir.2005) ('in the post-*Booker* world, the sentencing
6       guidelines are only advisory and the district court may
7       justify a sentence below the guideline level based upon a
8       broader appraisal')." *United States v. Menyweather, supra,*
9       431 F.3d 692, 700.

## IV.

## CONCLUSION

12      This is a highly unusual case and a very special man who made a terrible mistake
13  in judgment and engaged in conduct which was totally at variance with his entire
14  character and moral compass.  At some point, he realized that he was not going to
15  recover the losses incurred by continuing to invest and that he must stop.

16      In 42 years of practicing law in this state, most of which has involved defending
17  white collar crime cases, counsel herein has never seen an individual behave as Mr.
18  Ruderman did after he ceased his illegal conduct.  It was *his idea* not counsel's, to
19  come forward and fully confess his illegal conduct.  It was *his idea* to fully document
20  his wrongdoing by providing the prosecutors with *all* of the records of his wrongdoing.
21  It was *his idea* to prepare detailed schedules which enabled the agents to put together
22  a very complicate case in a few weeks.

23      This Court is well aware that is it far from typical for a person who has violated
24  the law to step forward *before* he has any idea that he is the subject of a criminal
25  investigation. More often, such an individual waits to see if he will be discovered and
26  whether or not the government will be able to prove his wrongful conduct.  Not Mr.
27  Ruderman!  Although it is true that the government had opened a file before Mr.

28

1   Ruderman stepped forward, it is clear that he had no idea of that fact and instead
2   believed that there was no investigation pending.

3   We do not suggest in this brief that Mr. Ruderman should not be sentenced to
4   some prison time and given probation and home detention. Clearly, the Court has the
5   authority to do that, and there are exceptional circumstances which would warrant it.
6   However, Mr. Ruderman and his counsel wish to be realistic. Some prison time is not
7   unreasonable under 3553. It is, however, the amount of that prison time which is at
8   issue here.

9   This brief has apprised the Court of several highly significant factors which, it
10  is submitted, strongly suggest a lower prison sentence. These begin with the pressures
11  and addictions which were the partial cause of Mr. Ruderman's conduct and continue
12  with his extraordinary behavior after the elected to stop.

13  Defendant should be sentenced to a sentence significantly below the advisory
14  guideline sentencing range in this case because the mitigating factors are both unusual
15  and significant. He himself was a victim of severe emotional and mental stress as well
16  as a serious gambling addiction he is treating but still getting over.  His acceptance of
17  responsibility and his substantial cooperation also merit a variance from the Guidelines
18  sentence because they show he is far ahead of the typical defendant toward achieving
19  the goals of sentencing in terms of rehabilitating his likelihood of recidivism and of
20  understanding what he did wrong and never to repeat the error.  He should not be
21  sentenced merely on the basis of the Guideline loss where, as here, that figure
22  represents a much higher number than the culpable loss (i.e., the loss he was criminally
23  responsible for), compared to losses that were the result of market conditions with
24  respect to monies he legitimately invested which did not show a positive return, and
25  compared to monies he invested with China Tel, a separate unrelated fraud on which
26  Defendant was a victim.  Finally, based on the truly extraordinary conduct of Mr.
27  Ruderman both when he realized he must stop his fraud and turn himself in, and when
28  he met with the Government without any contractual protection and presented the

1  result of 40 hours of work to make the case against himself, and to assist the
2  Government in understanding the details of his fraud, this is an unusual case in which
3  unusual significant mitigation is present.

4      For all the reasons set forth above, the Court is urged to impose as prison
5  sentence of 24 months followed by supervised release conditioned on further treatment
6  at Beit T'Shuvah, home detention and a substantial amount of community service. In
7  the alternative, the Court may consider that sentencing be postponed to permit Mr.
8  Ruderman to complete his treatment and stay at Beit T'Shuvah and continue to assist
9  the bankruptcy trustee and the receiver in recovering funds to repay the victims in this
10 case.

11 Dated:   December 15, 2009

12                              Respectfully submitted,

15                              JAMES D. RIDDET
                             Counsel of Record for Defendant
                             BRADLEY L. RUDERMAN

55