UNITED STATES v RUDERMAN
CR 09-0757 SVW

EXHIBIT 22

**U C L A** Neuropsychiatric Hospital

Neuropsychiatric and Behavioral Health Services

Medical Psychology Assessment Center
Neuropsychology

760 Westwood Plaza, C8-746
Los Angeles, California 90075

voice (310) 825-6646
fax (310) 206-8525

# Neuropsychological Examination Report

| | |
|---|---|
| **Name:** | Bradley L. Ruderman |
| **Medical Record #:** | 048-93-55 |
| **Date of Birth:** | 1-24-1963 |
| **Age:** | 46 |
| **Telephone number:** | 310-413-8449 |
| **Date of Examination:** | 8-4-2009, 8-6-2009, & 8-13-2009 |
| **Date of Report:** | 8-18-2009 |
| **Report From:** | Erica Coady, Ph.D., Jeffrey Schaeffer, Ph.D., ABCN/ABPP, Bill Steh, Ph.D. |
| **Referral Source:** | Timothy Fong, M.D. |

**Reason for Referral:**

The patient is a 46-year-old, right-handed, Caucasian male with a self-reported history of gambling addiction, and involvement in self-admitted illegal financial activities, who was referred for a neuropsychological evaluation by his psychiatrist to assess current cognitive functioning. It did not appear from the written referral information available to us that Mr. Ruderman has demonstrated or reported any known, or obvious, cognitive or intellectual difficulties or losses either currently or in the past.

This also appeared to be confirmed during the clinical interview when the patient was asked in general terms about his thought process and cognition, and reported no known difficulties in those particular domains. This, of course, does not rule out the possibility of more subtle disturbances of cognition and intellectual functioning, which may often be present in mood (such as anxiety and depressive disorders) and impulsive control-related disorders as well.

The examination was conducted on 8-4-09, 8-6-09, and 8-13-09 and completed in three sessions, with a total of 12 hours devoted to chart review, psychometric evaluation, report writing, and recommendations to staff. The information in this report was obtained from the patient and from his medical records. He was informed of the nature and purpose of the evaluation and limits of confidentiality prior to the clinical interview and from the administration of neuropsychological measures.

Exhibit 22

2

## History of the Presenting Problem:

Mr. Ruderman self-reported to us during the clinical interview that he is a "classic addict" with a gambling addiction that has been present for most of his adult life. He stated that he began gambling in high school with spending money he received from his parents, and gambled until he surrendered (stated to be on his own initiative) to federal agents in May 2009 and being criminally charged in federal court with allegedly organizing and maintaining a wire fraud scheme that also allegedly involved the patient bilking investors out of many millions of dollars. The patient stated that for a number of years he gambled (which he willingly admitted was still a problematic issue) with his personal income, separate from that of his clients accounts, which he earned running a successful financial advising and investment enterprise. He then reportedly began a hedge fund in 1999, again stated to be a completely legitimate undertaking with the purpose of making money based upon sound investments for his various clients.

Although Mr. Ruderman indicated that his financial dealings began as a legitimate financial investment enterprise a number of years previously, more recently when the economy experienced a downturn, his business suffered. According to the patient, it was at this time, for complicated reasons that will be reviewed in more detail, he essentially began to bilk his investors of their surviving assets. Mr. Ruderman further explained that despite the downfall of the markets being largely responsible for poor yield with his financial advising business, he felt "vulnerable and at fault," particularly because a large number of his clients were his friends and family members. The patient stated that rather than telling his clients the truth (in essence their money was "gone") that he continued to knowingly hide his unlawful dealings. He reported that he ultimately felt so guilty and remorseful for his activities that he decided to "turn himself in to authorities" and is currently involved in, and residing at, the Beit T'Shuvah Residential Treatment Program in Los Angeles, while the legal ramifications of his conduct play themselves out.

Mr. Ruderman explained some of his actions as to when they apparently went from what was felt by the patient to be "legitimate financial dealings," to "unlawful activities" involving the taking of money that was not rightfully his in order to support his gambling habit, by stating that he ultimately realized the difference between "right and wrong." However, he maintained the position that despite knowledge that his activities were unlawful to begin with, and were essentially supporting a "gambling addiction," he felt that he could "maintain control" and win back not only the lost earning for his clients, but make considerable profits for himself as well, despite the fact that this line of reasoning was known to the patient to be a virtual "impossibility." This seemingly "paradoxical reasoning" is not uncommon in those with gambling (as well as substance-related), impulsive control disorders and addictions.

The patient stated that his rational mind and feelings of guilt and remorse eventually began to influence his thinking, behavior and assessment of himself to an increasing extent, and that he stopped all of his gambling and illegal activities, following which he then turned himself in to authorities through his legal counsel, by his description. We have no way of knowing whether or not the patient's version of his activities and reported insights that eventually were said to have

Exhibit 22

USep. 21. 2009 11:04AM B10-206-6525          UCLA NEUROPSYCHOLOGY          No. 0978    P. 6    1)4/19
Case 2:09-cr-00757-JFW   Document 39-8   Filed 12/15/09   Page 4 of 27   Page ID #:504

3

led him to turn himself in, were a correct or an accurate representation of the reality of his situation however.

Further, Mr. Ruderman, as is also common in gambling and other impulsive control disorders and addictions, reported that from 2006-2009 as he began to lose large sums of money in poker games, that he also ceased to keep track of his "results," as an example of the level of "denial" in which he was engaged. He said since being in counseling through the residential facility where he now resides, he has been shocked to realize how much money he lost gambling, and apparently the fact that he was able to "deny" what in retrospect seemed to have been "impossible odds." Yet despite Mr. Ruderman's "intellectual recognition" of the "impossibility" of his goals, he continued to maintain his destructive behavior. Mr. Ruderman indicated that one of the other compelling factors that ultimately led him to turn himself in was the notion that he "did not want to be viewed as another Bernie Madoff."

The patient said that he is not certain about what he future holds for him. He is extremely anxious and remorseful concerning his behaviors and illegal activities, and noted that he has hearings pending in the near future that may determine whether or not he will be able to avoid trial, and to settle in some manner without having to spend time in prison. He noted that due to SEC sanctions, he is no longer legally able to manage others' financial investments and accounts; a sanction that he stated is consistent with his own (and others') best interests he believes, due to his past inability to control his own behavior and the activities that he engaged in that he reportedly recognized as completely illegal, even as he was actively engaged in them.

He also reported that as a consequence of his activities, he has now "lost interest in a finance career" due to the "devastation" of his clients' assets that he was legally, ethically and morally bound to protect, and now considers himself to be a "complete failure." He stated that since turning himself in to authorities, he has developed an interest in the area "prevention" in the hope that he may be able to do something useful for society by counseling others, including youth, to not engage in gambling or illegal financial activities. This concept would seem to be meritorious, and perhaps further underscores the level of his realization as to how his illegal activities. as well as his longer-term gambling behaviors, have so adversely affected others.

**Pertinent Medical History:**

The patient denied a history of chronic medical or neurological disease, or prior head injury or loss of consciousness. He denied any known history of any type of learning disability, cognitive disorder, and any past or more recent loss of his mental or cognitive skills. He reported having asthma since childhood and twice being hospitalized for gastro-intestinal issues before adulthood. The patient's father is still living and works in the financial advising business. His father apparently has an excellent reputation within the local investment community, and was never alleged to have been involved in (or to have any prior knowledge) of any of his son's dealings in any manner whatsoever. The patient's mother is deceased due to cancer.

Medical records indicate that the patient was examined by Timothy Fong, M.D., at the UCLA Adult Psychiatry Outpatient Clinic on 7-6-09. Dr. Fong found that the patient presented with "a history of lifetime gambling and generalized anxiety disorder coupled with an approximately

Exhibit 22

ᵁˢep. 21. 2009²:11:04AM10-205-6525          UCLA NEUROPSYCHOLOGY      No. 0978   P. 7   05/19
Case 2:09-cr-00757-JFW   Document 39-8   Filed 12/15/09   Page 5 of 27   Page ID #:505

4

three year history of pathological gambling behaviors." Dr. Fong recommended the patient be monitored monthly in terms of psychiatric care, to continue with residential treatment and counseling, and to undergo neuropsychological assessment in order to rule out the existence of any cognitive impairment that may be evident or could be documented with standardized psychometric measures, with particular attention to the Frontal and Executive Systems domain. At the time of the neuropsychological examination, the patient's medications included Advair, Flonase, Singular, and albuterol. Dr. Fong did not recommend any psychotropic medications for the patient or any additional specific psychotherapy programs apparently, beyond that which he is currently participating in at the residential treatment center.

## Substance Use/Abuse:

The patient reported that he rarely drinks alcohol, and consumes approximately 1-2 alcoholic beverages per occasion. He denied ever drinking excessively in the past. He also denied smoking cigarettes or abusing prescription or illicit medications.

## Developmental, Social, and Occupational History:

Mr. Ruderman was born and raised in Los Angeles, California. As far as the patient knew, he had been the product of a normal pregnancy and delivery. His developmental milestones to the best of his knowledge had been achieved in a timely manner. The patient reported that he was the eldest child, and has a younger sister and brother. He noted that as the oldest child, it seemed to him that his parents held him in such high regard, and as a "role model" for his younger siblings, that they always expected exceptional performances from him. Mr. Ruderman recalled always feeling a sense that he had "nowhere to go but down."

Thus, despite whatever accomplishments the patient achieved, either academically, in business, or in any other part of his life for that matter, he could recall only feeling "unfulfilled" and a "failure to meet the mark" or "live up to expectations" despite his accomplishments. He recalled a sense of needing or wanting to accomplish "something stellar" in his life, but never knowing just what to do or how to do it.

Mr. Ruderman said he earned good grades in high school and maintained nearly all A's throughout school. He graduated from high school and earned a bachelor's degree in Political Science from UCLA in 1986. After graduating from college, the patient reported that he chose to follow in the same line of business as his father, but did not want to join his father's firm more specifically. Hence, he moved to New York City and worked in the finance business on Wall Street for some four years. He reported that he was earning "good money" during this time, which was sufficient to support his ongoing gambling "habit" that began sometime during his high school years.

Several years later, Mr. Ruderman reportedly returned to Los Angeles and married when he was 29-years-old. The patient reported that the marriage lasted for six years and ended because he and his ex-wife were taking two "divergent paths in life." He reported that throughout his marriage he refrained from gambling, as his wife would have noticed that he was spending large sums of money. This appeared to be the only sustained period of time following the onset of his

Exhibit 22

Case 2:09-cr-00757-JFW   Document 39-8   Filed 12/15/09   Page 6 of 27   Page ID #:506

5

gambling behaviors that Mr. Ruderman was allegedly able to refrain from this activity. Despite their divorce, the patient indicated that he and his ex-wife remain on "friendly terms." By his report, shortly after the divorce, his gambling resumed.

## Behavioral Observations and Mental Status Examination:

Mr. Ruderman presented as a well-groomed man, and was casually dressed in shorts and flip flop-type sandals on each of the three days of the assessment and clinical interview. He appeared his stated age. The first day of evaluation he arrived 30 minutes late for his appointment, citing bad traffic, but was on time for the two subsequent appointments. His gait was appropriate and no obvious motor difficulties were observed, although it was noted that he walked with a slight limp.

Hearing and vision were judged to be adequate for purposes of the assessment. Mr. Ruderman maintained good eye contact, with appropriate social interactions with the examiners at all times. The patient's speech and language was of normal rate and rhythm, and free from paraphasic errors. No evidence of loss of verbal fluency or word finding difficulties was noted. Naming skills were also intact. Pragmatics and prosody were normal and qualitatively, the patient was noted to articulate himself well. Conversational content was appropriate and consistent with the topics being discussed. At no time did Mr. Ruderman demonstrate any obvious cognitive deficits that were apparent based upon the interview only, or by observing his behavior and interactions with us.

Mr. Ruderman demonstrated a well-organized and logical thought process, without signs of confusion or perseveration in terms of our interactions with him. There was no evidence of unusual or bizarre thought process or ideation that was evident. There were no features to suggest delusional or paranoid thought content or any other evidence suggestive of psychotic thought. He appeared to be genuinely distressed, if "puzzled," by his more recent behavior (including apparently illegal financial dealings), and expressed feeling extremely guilty and remorseful over the apparently disastrous situation he had caused for many of his clients.

As a consequence of the above, he presented as a somewhat serious, anxious and mildly depressed individual, and did not often initiate conversation. Comprehension of spoken speech was adequate and he appeared to understand all directions for psychometric measures that were administered without difficulty. However, one task (the DKEFS Design Fluency) was considered invalid because the patient did not appear to understand the directions. However, it should be noted the instructions for this particular component of the DKEFS are considered unclear by many examiners anyway, through no fault of the patient, and at times appear to present problems for many individuals not related to clinical issues. Thus, this particular measure was eliminated from consideration with respect to the overall interpretation of results and findings.

Throughout the assessment, we believed Mr. Ruderman to be putting forth a good effort on the various psychometric tasks presented to him. Thus, the assessment results are considered to be a valid representation of his current level of intellectual, cognitive, and behavioral functioning.

Exhibit 22

USep. 21. 2009 2:11:04AM₁B~2B6-B525    UCLA NEUROPSYCHOLOGY    No.0978    IP. 9    07/19
Case 2:09-cr-00757-JFW    Document 39-8    Filed 12/15/09    Page 7 of 27    Page ID #:507

6.

## PSYCHOMETRIC MEASURES ADMINISTERED:

Beck Anxiety Inventory (BAI)
Beck Depression Inventory (BDI)
Boston Naming Test
California Verbal Learning Test, 2nd edition (CVLT-II)
Connors Continuous Performance Test (CPT)
Delis-Kaplan Executive Functioning System (DKEFS) Tail Making Test, Verbal Fluency,
    Design Fluency, Color-Word Interference, Tower Test
Dynamometer
Grooved Pegboard Test
Millon Clinical Multiaxial Inventory – $3^{nd}$ Edition (MCMJ-III)
Minnesota Multiphasic Personality Inventory - 2nd Edition (MMPI-2)
Rey-Osterrieth Complex Figure Test
Stroop – Golden Version
Test of Memory Malingering (TOMM)
Victoria Symptom Validity Test (VSVT)
Wechsler Abbreviated Scale of Intelligence (WASI) Vocabulary, Similarities, Block Design,
    Matrix Reasoning
Wechsler Memory Scale-III (WMS-III); Logical Memory, Digit Span, Visual Reproduction
Wisconsin Card Sorting Test (WCST)
Wechsler Test of Adult Reading (WTAR)
Word Memory Test

## ASSESSMENT RESULTS:

### Effort Level and Symptom Validity:

The patient was administered three measures used to assess cognitive effort. Results indicated
the patient was putting forth adequate effort on two memory measures and one task of sustained
attention. The patient's performance fell within expected limits on these measures.

### General Intellectual Functioning:

The patient's performance on a measure of single word reading used to estimate premorbid
general intellectual functioning was found to fall within the high average range, although this
could represent a slight underestimate of his true developmental intellectual level, which could
perhaps fall within the superior range given his educational and professional background. His
performances on various verbal subtests were within the average range on a test of verbal
abstract reasoning and in the low average range on a task of vocabulary, and both were
somewhat lower than expectation. Performances on non-verbal tasks of spatial perception and
non-verbal abstract problem solving were found to fall within the high average range and
commensurate with expected levels.

It should be noted that Mr. Ruderman has relative weaknesses in verbal abilities when compared
to non-verbal. Additionally, considerable variability was noted in both verbal and non-verbal

Exhibit 22

CSep. 21. 2009 11:05AM LB-286-8525          UCLA NEUROPSYCHOLOGY       No. 0978  P. 10
Case 2:09-cr-00757-JFW   Document 39-8   Filed 12/15/09   Page 8 of 27   Page ID #:508

7

domains throughout testing, with performances ranging from the very superior down to borderline and even a couple of areas of impaired performance, which were not anticipated, and unusual for an individual of Mr. Ruderman's developmental, educational and professional background. Mr. Ruderman's rather pervasive anxiety during the assessment process may be the clearest and most logical explanation for some of the findings that fell below expectation in these and other areas of the assessment as well.

As will be seen, there are a number of areas in which Mr. Ruderman demonstrated weaker performances, some falling within the impaired range, but they do not necessarily appear to follow a logical or clear-cut pattern that would point more in the direction of a well-defined neuropathological process, per se (although some difficulties within the Executive and Frontal Systems domain may potentially be inferred). Rather, the off/on pattern of performances in some areas is much more common to anxious and mood-disordered individuals, in some cases where anxiety may lead to some fluctuating levels of attention and concentration (although not necessarily on actual measures of these functions, interestingly) and impulsive responding, as well as lowered levels of planning and organizational strategy. However, when all of the measures in which Mr. Ruderman did display at least one component in which performance was impaired are considered together, a possibility is raised of a subtle Executive and Frontal Systems "weakness" or possible mild deficit, of completely uncertain etiology. The implications of this general finding or "theme" of the assessment will be discussed further on in the report.

**Attention and Concentration:**

The patient performed within the very superior range on a measure of simple auditory attention requiring him to repeat a series of digits. He was able to repeat a span of 8 digits forward and 8 digits backward. His performance on tasks of scanning and visual tracking also fell within the high average range. Abilities on measures of speed of processing for word reading and color naming were found to fall within the average range. Performance on a measure of sustained attention was found to fall within expected limits. In general, these scores suggest average to high average processing speed, visual scanning and tracking, and superior abilities for simple and complex auditory attention.

**Speech and Language:**

Unexpectedly, Mr. Ruderman's performance on a measure of verbal confrontational naming was found to fall within the borderline impaired range and markedly lower than expectation, especially given his educational background. On this task, the patient struggled to name pictures of common objects and was not aided by categorical or phonemic cues. His performance on a task of verbal fluency based on phonemic cueing was found to fall within the low average range, while verbal fluency based on semantic cues was within the high average range.

Cumulatively, these scores suggest that the patient is performing at a level that is not entirely commensurate with his educational level and estimated premorbid functioning on tasks of rapid verbal retrieval for measures of categorical fluency, and his ability on tasks of verbal fluency based on phonemic retrieval and retrieval based on pictures of objects indicates some degree of inefficiency. The clinical significance of this finding is unclear, although such variability is not

Exhibit 22

8

uncommon in patients with anxiety disorders, if there is no other clear-cut neurological deficit to better explain the findings, which there does not appear to be in Mr. Ruderman's case.

## Visuospatial and Visuoconstructive Functioning:

The patient's ability to perceive, arrange, organize, and reproduce abstract components of a complex picture was found to be in the impaired range ($<1^{st}$ percentile), and lower than expectation. The patient completed this task in a less organized than expected manner with functional appreciation of the overall gestalt of the figure. Although all elements of the design were present, he made obvious spatial errors, resulting in his score being in the impaired range. This finding may suggest some deficit of visual information processing or spatial perception, even though the overall "gestalt" of the figure was well preserved.

It may well be that Mr. Ruderman's anxiety related to his performance was the salient clinical feature which could have explained this relatively unexpected finding, especially in light of other areas of visuo-perceptual functioning that seemed well-preserved by comparison. These "detail oriented" spatial errors lowered the patient's score considerably. By contrast, his ability to understand the relationship between individual component parts and the complete model when asked to arrange 3-D blocks to match a two dimensional visual design was found to fall within the high average range and consistent with expectation, as was his performance on a measure of non-verbal spatial reasoning. Here again, although some variability was identified between various tasks, overall performance on visuo-perceptual and visuo-constructive tasks appeared to be adequate.

## Learning and Memory:

Performance on a task of learning new, contextual information was found to fall within the average range, and his ability to remember this information after a short delay was also in the average range, both approximately commensurate with expectation. His performance on a list learning test was also generally in the average range and consistent with expectation. On this task, the patient tended to learn additional words with nearly every trial and was eventually able to learn 12 of 16 words. After a short delay, he was able to remember 8 out of 16 words, a performance that fell within the average range. However, he was not assisted by the use of categorical cues. After a longer delay, the patient was again able to remember 8 out of 16 words, and with categorical prompts, was able to able to recall 9 out of 16 words. Overall, the patient was found to be performing within expectation on measures of verbal learning and memory.

On a task of learning simple visual designs and remembering them after a short delay, the patient's performance was in the average range, and consistent with expectation. His ability to recognize these newly learned designs and distinguish them from foils fell within the low average range, slightly below expectation. On a more complex task, which involved the patient recalling and drawing a previously learned complex figure after both a short and long delay, his performances fell within the impaired range. On the short delay component, the patient's drawing of the figure was disorganized, impoverished, and included spatially incorrect information, as well as errors of omission and commission. On the long delay the patient's

CONFIDENTIAL REPORT

Exhibit 22

9

drawing appreciated the overall gestalt of the design, but again included errors of commission and omission.

Thus, on measures of both auditory verbal learning and memory as well as non-verbal visual learning and memory, Mr. Ruderman demonstrated significant variability of performances ranging from high average down to impaired ranges. Here again, despite Mr. Ruderman demonstrating seemingly unimpaired memory capacities during the clinical interview, his performance on psychometric measures of learning and memory was variable with some areas of weakness and impairment identified. While the clinical significance of these findings remains somewhat unclear, it could well be that anxiety was the most probable factor that would best explain the variable findings in a number areas of the assessment, including tasks of learning and memory.

### Fine Motor and Manual Dexterity:

The patient's performance on a measure of fine motor speed and manual dexterity was found to demonstrate mixed results. His right (dominant) handed performance was in the borderline impaired range, and well below expectation, while performance with his left (non-dominant) hand fell within the average range, and commensurate with expectation. Here again, the clinical significance of this finding is less clear, since there is no known injury involving the right hand or arm, nor any known focal neurological disease process that could potentially explain a non-dominant finding.

On the other hand, emotional and mood-related factors (such as anxiety) may have played a role. By comparison, and inconsistent with performance on the Grooved Pegboard Test, his performance on a measure of grip strength was found to fall within the average range bilaterally, commensurate with expectation. Thus, a general screening of his fine motor skills and manual dexterity ranged from within expectation to below expectation, but for reasons that seemed less clear.

### Executive and Frontal Systems Functioning:

Performance on a non-verbal problem-solving task requiring cognitive flexibility and the ability to profit from feedback was found to fall well within normal limits and commensurate with expectation. It was noted, however, that despite generally adequate performances on this measure (Wisconsin Card Sorting Test), he did lose set on two occasions, again well below expectation for an individual of his educational and professional background. Performance on a test of non-verbal planning and incorporating rules to solve spatial puzzles was in the average range and within expectation.

As previously reviewed, Mr. Ruderman's ability to organize and recreate a complex design was in the impaired range ($<1^{st}$ percentile) and markedly below expectation as previously reviewed. The patient's approach to solving this task was somewhat less organized and spatially inaccurate in copying the individual design components to translate them into a complete design that essentially duplicated the stimulus graphic. Here again, this was the only spatial task that seemed problematic for him, and in this sense, was more of an "outlier" than being more

Exhibit 22

CONFIDENTIAL REPORT

10

consistent with a pattern of difficulty on visuo-perceptual and spatial tasks more generally, but it may suggest difficulty with organizing complex spatial material, and thus implicate involvement of frontal-parietal pathways.

His abilities on tasks of verbal phonemic fluency were found to fall within the low average range, and below expectation. His performance on tasks of categorical fluency when switching between sets was found to fall within the average and high average ranges, and commensurate with expectation. His performance on verbal tasks of cognitive flexibility and inhibiting an "expected or programmed automatic response" was found to fall within the average to high average range, again within expectation. Performances on tasks of verbal abstract reasoning were performed within expectation.

Thus, with respect to the original referral question that was directed toward the issue of Executive and Frontal Systems functioning, Mr. Ruderman demonstrated a somewhat mixed picture of performances ranging from High Average down to Impaired levels. As stated previously, none of the areas in which weaker performances or those that actually fell within the impaired range seemed to point to a distinct profile that would be predictive of a given neuropathological picture or regional distinction regarding brain-behavioral relationships per se; however, there are cases in which more subtle pictures of developmental Executive and Frontal Systems dysfunction may present in such a "diffuse" and somewhat inconsistent manner. As such, we cannot entirely rule out the possibility of some subtle neuropathological process, although the more likely explanation for the current selected and somewhat inconsistent findings would seem to point more in the direction of emotional and mood-related factors at this juncture.

Indeed, there is a nascent literature that has attempted to examine a number of disorders that include antisocial personality, substance and impulse control-related disorders, as they may relate to subtle neuropathological findings of cerebral structure and physiology. It appears that this literature remains more in the realm of research that considers possible "correlates" (perhaps more on a neurodevelopmental basis) of such behavioral disorders, but necessarily either predictive or diagnostic of them.

## PSYCHODIAGNOSTIC ASSESSMENT RESULTS:

### *MMPI-2:*

As a part of the current assessment, Mr. Ruderman completed the Minnesota Multiphasic Personality Inventory (MMPI-2). His profile was found to be valid for the purposes of clinical correlation and interpretation. His pattern of responding to questionnaire items indicated that he was able to read and comprehend the items (567 items, true-false), and that he had responded to them in an open, non-defensive manner, endorsing a variety of symptoms. His responses indicate a tendency toward being suspicious and guarded (perhaps not surprising, given his present life circumstances, and the uncertainty that lies ahead for him), and to perhaps feel that others "may be out to get him" (based upon some of his item endorsements and clinical profile, which is actuarial in nature, and must be confirmed on a clinical basis as well). His responses also suggested feelings of insecurity and a need to maintain emotional reserve and interpersonal

Exhibit 22

°Sep. 21. 2009 11:05AM810-286-8525          UCLA NEUROPSYCHOLOGY     No. 0978   P. 14 12/13
Case 2:09-cr-00757-JFW   Document 39-8   Filed 12/15/09   Page 12 of 27   Page ID #:512

11

distance. Such individuals can often appear to be superficially affable, although much more so in a context in which they feel confident, in charge, and comfortable with their surroundings.

On the other hand, such individuals tend to do rather poorly in social situations in which more interpersonal dynamics and intimacy are the focus, and then may appear much more distant, disinterested, or self-absorbed, as a defense against social anxiety. Patients with this profile may also consciously experience occasional feelings of underlying distress and emotional turmoil, which will then "drive them" toward various behaviors as a distraction or method of maintaining control (gambling among them). Periods of acute psychological turmoil and feelings of alienation are likely to have been present since childhood or early adolescence and to be recurrent. Such feelings may at times lead the individual to feel "out of step" with peers and other social contacts, leading to fears of having been misperceived or misunderstood by others. This may have been generated much earlier in the patient's life, on a developmental basis, regarding childhood, adolescent, sibling, and parental relationships.

### *MCMI-III:*

Mr. Ruderman also completed the 175 item (true-false) Millon Clinical Multiaxial Inventory (MCMI-III). The patient produced a valid profile on the MCMI-III. His pattern of responding to items indicated that he was able to read and understand the items of the inventory without difficulty, as he did with the MMPI-2. He appeared to take the position of being extremely revealing of himself and his perceived areas of difficulty in his response style to the MCMI-III. His profile included marked elevations on scales assessing depression and anxiety, and mild elevations on scales assessing avoidant, passive-aggressive, and dysthymic traits, the latter of which are likely to be lifelong characterological traits (such as avoidant, passive-aggressive, and perhaps self-defeating features of his personality).

## CONCLUDING REMARKS AND RECOMMENDATIONS:

### A.   Brief Summary of Findings:

Mr. Ruderman is a 46-year-old, right-handed, Caucasian male with 16 years of education. He was referred for a neuropsychological evaluation by his treating psychiatrist. The patient's medical history is unremarkable for major illness or accidents, while his psychiatric history, per his psychiatrist, is significant for heightened anxiety. Mr. Ruderman presents with subjective complaints of sadness and anxiety. Additionally, he reports a 30-year history of gambling, and is currently accused of heading an illegitimate hedge fund business that swindled $44 million dollars from investors. Prior to the evaluation he stated he would like to know potential neurological causes for his gambling behavior.

Measures of general intellectual ability estimate that Mr. Ruderman is likely performing in the high average range on most tasks of non-verbal intellectual functioning, and in the average to low average range on tasks of verbal intellectual functioning. This discrepancy may represent a long-standing verbal weakness or possible learning disorder, a diagnosis that was not fully

Exhibit 22

12

assessed under the scope of this evaluation. However, there may be additional factors that are also contributing to his current neurocognitive presentation.

Objective assessment of his neuropsychological status revealed that Mr. Ruderman is performing within expectation in most areas of cognition. Generally, his performances on the majority of tasks that assessed the various domains of this examination were found to be performed within expected limits (Average to Superior ranges). However, as mentioned in the earlier portions of this report, there were also selected areas in which subtle difficulties were also identified, the significance of which yet remains somewhat unclear. The findings of the current examination do not point to a specific profile of deficits that would logically lead to a conclusion of an acquired neurocognitive disorder due to a defined neuropathological injury or disease process.

On the other hand, the general "theme" of these somewhat disparate findings would include possible Executive and Frontal Systems dysfunction, which could have been evident in a very subtle form on a developmental basis. Also, as previously discussed, at least some of the findings, if not all, could potentially be explained on the basis of pervasive anxiety and distress given his present life circumstances. Mood-related factors are also well known to interfere with performance on neuropsychological measures as well.

However, Mr. Ruderman had some areas of weakness. One was that of the marked split between his verbal and non-verbal general abilities. On testing he exhibited difficulty with rapid verbal retrieval tasks based on phonemic cues and visual confrontational naming. This finding may be related to his aforementioned language difficulty. Mr. Ruderman also demonstrated relative weaknesses in some areas of planning and organizing complex visuo-spatial information. However, his performance on a measure of planning and solving a manual tower task was found to fall within the average range and commensurate with expectation.

Based on these findings, it appears Mr. Ruderman has at least mild difficulty on a selective basis organizing visuo-spatial material when the information is complex, and he becomes overwhelmed, a finding that perhaps is at least somewhat consistent with published neuroimaging studies of orbital-frontal functioning in individuals with gambling and other impulse control related disorders, as well as antisocial personality. Whether such studies bear any relevance to Mr. Ruderman's specific case is unknown, since they have been conducted for research purposes, and in order to search for possible "correlates" rather than as specific diagnostic tools or "markers" at this point in time at least, in order to specifically identify certain disorders.

Mr. Ruderman reported moderate-level emotional and psychological symptoms on questionnaires (MMPI-2 and MCMI-III) that suggested the presence of significant mood-related issues, as well as issues regarding self-concept and interpersonal functioning that are likely to have been problematic for Mr. Ruderman. On interview, the patient disclosed intense feelings of anxiety regarding his current legal issues and articulated that he felt deep regret for betraying the confidences of his investors, many of whom were family and friends.

Based on these results on psychodiagnostic assessment, Mr. Ruderman appears to be an individual with at least some antisocial tendencies who believed he was in control of his situation

Exhibit 22

13

when he was apparently raising money from hedge fund investors to pay debts on high stakes poker games (assuming the history that we took from the patient is, in fact, correct). While neuropsychological deficits cannot account for his criminal behavior, he does appear to have some subtle selected areas of cognitive weakness and impairment, the significance of which remains unknown relative to his history of chronic and nearly lifelong gambling, as well as more recent allegedly criminal activities regarding his financial dealings.

## B. Recommendations:

1. We strongly suggest Mr. Ruderman continue to participate wholly in his gambling addiction program and follow all recommendations of the program for treatment and aftercare.

2. We also suggest that Mr. Ruderman continue with recommended follow-up appointments with his psychiatrist, Dr. Fong, in order to be further assessed regarding any possible emerging need for psychotropic medication that may be indicated, given that Mr. Ruderman does appear to be at least moderately anxious and depressed, in part related to his currently unfavorable circumstances.

3. Further, as circumstances begin to move forward in his legal case, we cannot rule out the possibility that Mr. Ruderman's level of depression may increase to a severe level, and that he may begin to harbor active thoughts of harming himself or taking his own life (which has happened at times in cases such as this in an otherwise non-suicidal individual, subsequently facing criminal charges, conviction and a long prison sentence).

4. We would recommend that given the results of our recent Neuropsychological examination which are "equivocal" regarding the issue of possible subtle Executive and Frontal Systems deficits, Mr. Ruderman undergo a screening Neurological examination, and perhaps screening MRI neuroimaging as well, just to make sure that there is no underlying neuropathological disease process that has remained, thus far, undiscovered, however unlikely this would be.

5. A repeat neuropsychological evaluation may be warranted if Mr. Ruderman, or others, should perceive any changes or apparent declines of his cognitive functioning in the future. Any future evaluations could be compared to the current database, which may serve as a baseline.

## Suggested DSM IV Multi-Axial Diagnosis:

Axis I:     Rule-out 294.9 Cognitive Disorder, NOS
            312.31 Pathological Gambling (Impulse Control Disorder) (Gambling)
            309.28 Adjustment Disorder, with Mixed Anxiety and Depressed Mood
            (mild level)
            300.02 Generalized Anxiety Disorder (per Dr. Fong)

Exhibit 22

14

| | |
|---|---|
| Axis II: | No Specific Diagnosis<br>(Rule out Antisocial Personality traits, Avoidant, and Self-Defeating features) |
| Axis III: | No obvious or presently identified medical or neurological condition |
| Axis IV: | Problems related to social environment and impending legal proceedings and possible prison sentence due to presumed criminal activity |
| Axis V: | Current GAF = 61-70, some mild areas of impaired functioning in daily life, based upon patient's self-report, primarily related to the above factors |

Signatures to follow

Thank you for the opportunity to participate in Mr. Ruderman's health care. If you have any questions, or if we can be of further assistance, please feel free to contact us at (310) 206-7313.

_E. Coady_

Erica Coady, Ph.D.
Neuropsychology Postdoctoral Fellow
Medical Psychology Assessment Center
UCLA Semel Institute/Resnick Hospital

Jeffrey Schaeffer, Ph.D., ABCN/ABPP
Clinical Professor of Psychiatry and Biobehavioral Sciences
Senior Clinical Supervisor
Medical Psychology Assessment Center
UCLA Semel Institute/Resnick Hospital

Bill Steh, Ph.D.
Assistant Clinical Professor
Associate Director of Clinical Services
Medical Psychology Assessment Center
UCLA Semel Institute/Resnick Hospital

Exhibit 22

15

## Neuropsychological Assessment Summary Sheet

| **Name:** | Bradley Ruderman | **Education:** | 16 |
|---|---|---|---|
| **Date of Birth:** | 1-24-1963 | **Date of Evaluation:** | |
| **Age:** | 46 | **Handedness:** | Right |

| Neuropsychological Test | Raw Score | Scaled Score | Percentile | *Rating* |
|---|---|---|---|---|
| **Symptom Validity Testing** | | | | |
| **WMT** | | | | |
| IR     97.5% | - | - | - | WNL |
| DR     90.0% | - | - | - | WNL |
| CS     87.5% | - | - | - | "Caution" |
| MCR   70.0% | - | - | - | BNL |
| PA     55.0% | - | - | - | - |
| FR     55.0% | - | - | - | - |
| LDFR   45.0% | - | - | - | - |
| | | | | |
| **TOMM** | | | | |
| Trial 1 | 50/50 | - | - | WNL |
| Trial 2 | 50/50 | - | - | WNL |
| Trial 3 | - | - | - | - |
| | | | | |
| **VSVT** | | | | |
| Easy Items | 24/24 | - | - | Valid |
| Difficult Items | 24/24/ | - | - | Valid |
| Total Items | 48/48 | - | - | Valid |
| | | | | |
| **Intellectual Functioning** | | | | |
| WTAR              VIQ = 114 | 40 | 110 | 81 | High Average |
| | | | | |
| WASI FSIQ | - | IQ=102 | 55 | Average |
| Verbal | - | IQ=89 | 23 | Low Average |
| Performance | - | IQ=116 | 86 | High Average |
| **WASI *Verbal Subtests*** | | | | |
| Vocabulary | 50 | T = 41 | 19 | Low Average |
| Similarities | 32 | T = 46 | 35 | Average |
| **WASI *Performance Subtests*** | | | | |
| Block Design | 55 | T = 61 | 86 | High Average |
| Matrix Reasoning | 26 | T = 58 | 80 | High Average |
| | | | | |
| **Attention/Concentration** | | | | |
| WMS-III Digit Span | 27 | 17 | 99 | Very superior |
| Forward (span of 8) | 14 | | | |
| Backward (span of 8) | 13 | | | |
| | | | | |
| DKEFS Visual Scanning | 17 | 13 | 84 | High Average |
| DKEFS Number Sequencing | 21 | 13 | 84 | High Average |

Exhibit 22

| | Raw | SS | %ile | Rating |
|---|---|---|---|---|
| DKEFS Letter Sequencing | 23 | 12 | 75 | High Average |
| DKEFS Motor | 14 | 13 | 84 | High Average |
| | | | | |
| DKEFS Color Naming | 28 | 10 | 50 | Average |
| DKEFS Word Reading | 20 | 11 | 63 | Average |
| | | | | |
| Continuous Performance Test | | | | |
| # of Omissions | 0 | T = 42 | 21 | WNL |
| # of Commissions | 10 | T = 45 | 31 | WNL |
| Hit RT | 380.8 | T = 49 | 46 | WNL |
| Hit RT Std. Error | 6.8 | T = 61 | 86 | Mildly Atyp |
| Variability | 8.2 | T = 58 | 79 | WNL |
| | | | | |
| **Language** | | | | |
| Boston Naming Test (49,50,51) | 50 | z = -1.5 | 7 | Borderline |
| | | | | |
| Letter Fluency – FAS F = 10, A = 11, S = 9 | 30 | 7 | 16 | Low Average |
| Category Fluency Animals = 22, Boys Names = 26 | 48 | 13 | 84 | High Average |
| | | | | |
| **Visuospatial Skills** | | | | |
| Rey-O Complex Figure Copy | 30.0 | - | >1 | Impaired |
| | | | | |
| WASI Block Design | 55 | T = 61 | 86 | High Average |
| WASI Matrix Reasoning | 26 | T = 58 | 80 | High Average |
| | | | | |
| **Verbal Learning and Memory** | | | | |
| WMS-III Log. Mem. I (11, 10,16) | 37 | 9 | 37 | Average |
| WMS-III Log. Mem. II (9, 13) | 22 | 10 | 50 | Average |
| Logical Memory Recognition | 24/30 | | | |
| | | | | |
| CVLT –II Total (6, 9, 6, 12, 12) | 45 | T = 51 | 55 | Average |
| List A Trial 1 | 6 | z = -.5 | 31 | Average |
| List A Trial 5 | 12 | z = .5 | 69 | Average |
| List B | 4 | z = -1.0 | 16 | Low Average |
| Short Delay Free Recall | 8 | z = -.5 | 31 | Average |
| Short Delay Cued Recall | 7 | z = -.1 | 16 | Low Average |
| Long Delay Free Recall | 8 | z = -.5 | 31 | Average |
| Long Delay Cued Recall | 9 | z = -.5 | 31 | Average |
| Recognition Hits | 12 | z = -1 | 16 | Low Average |
| Recognition False Positives | 4 | z = -.5 R | 31 | Average |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Exhibit 22

17

| | Raw | SS | %ile | Rating |
|---|---|---|---|---|
| **Nonverbal Memory** | | | | |
| WMS-III Visual Reproduction I | 81 | 9 | 37 | Average |
| WMS-III Visual Reproduction II | 54 | 10 | 50 | Average |
| Visual Reproduction Recognition | 40/48 | 7 | 16 | Low Average |
| | | | | |
| Rey-Osterrieth 3' Delay | 4.0 | T < 20 | <1 | Impaired |
| Rey-Osterrieth 30' Delay | 9.5 | T = 24 | <1 | Impaired |
| Recognition of Figure | Yes | | | |
| | | | | |
| **Motor** | | | | |
| Grooved Pegboard | | | | |
| DH | 87.0 | T = 33 | 5 | Borderline |
| NDH | 69.0 | T = 50 | 50 | Average |
| | | | | |
| Dynamometer | | | | |
| DH | 49.0 | T = 47 | 38 | Average |
| NDH | 45.0 | T = 48 | 42 | Average |
| | | | | |
| DKEFS Motor | 15 | 13 | 84 | High Average |
| | | | | |
| **Executive/Frontal Systems** | | | | |
| WCST - # of trials | 94 | | | |
| Categories Completed | 6 | -- | >16 | WNL |
| Errors | 17 | T = 47 | 50 | Average |
| Perseverative Responses | 10 | T = 45 | 51 | Average |
| Perseverative Errors | 10 | T = 45 | 50 | Average |
| Failure to Maintain Set | 2 | - | 6-10 | Borderline – LA |
| | | | | |
| DKEFS Number-Letter Switching | 67 | 11 | 63 | Average |
| | | | | |
| DKEFS Design Fluency: Filled | - | - | - | Invalid |
| DKEFS Design Fluency: Empty | - | - | - | Invalid |
| DKEFS Design Fluency: Switching | - | - | - | Invalid |
| | | | | |
| Letter Fluency – FAS F = 10, A = 11, S = 9 | 30 | 7 | 16 | Low Average |
| Category Fluency Animals = 22, Boys Names = 26 | 48 | 13 | 84 | High Average |
| Category Switching | 15 | 11 | 63 | Average |
| Category Switching Accuracy | 14 | 12 | 75 | High Average |
| | | | | |
| DKEFS Stroop Inhibition | 43 | 13 | 84 | High Average |
| DKEFS Stroop Inhibition/Switching | 61 | 10 | 50 | Average |
| | | | | |

Exhibit 22

18

| | Raw | SS | %ile | Rating |
|---|---|---|---|---|
| DKEFS Stroop Interference | 26 | 11 | 63 | Average |
| | | | | |
| DKEFS Tower Test – Achievement Score | 16 | 10 | 50 | Average |
| | | | | |
| WASI Similarities | 32 | T = 46 | 35 | Average |
| | | | | |
| **Emotional/Behavioral** | | | | |
| MMPI-2 | | | | Please see report |
| MCMI-III | | | | Please see report |
| | | | | |
| BAI | 25 | - | - | Moderate |
| BDI | 29 | - | - | Severe |

UNITED STATES v RUDERMAN
CR 09-0757 SVW

EXHIBIT 23

UNIVERSITY OF CALIFORNIA, LOS ANGELES

UCLA

BERKELEY · DAVIS · IRVINE · LOS ANGELES · RIVERSIDE · SAN DIEGO · SAN FRANCISCO



SANTA BARBARA · SANTA CRUZ

Timothy Fong MD
Assistant Clinical Professor of Psychiatry
Director, UCLA Gambling Studies Program
Director, UCLA Addiction Psychiatry Fellowship
Director, UCLA Addiction Medicine Clinic
760 Westwood Ave, Room C8-887
Los Angeles, CA 90024
Phone: 310-825-1479
Fax: 310-825-0301
e-mail: tfong@mednet.ucla.edu

James D. Riddet
Stokke & Riddet
3 MacArthur Place
Suite 750
Santa Ana, CA  92707
Telephone:  714/662-2400
Facsimile:  714/662-2444

Re: Summary of Findings and Medical Opinion for Bradley Ruderman,

Dear James,

I am attaching my medical evaluation of Bradley Ruderman, along with my recommendations and opinions in regards to treatment.

I first evaluated Brad at UCLA on July 6, 2009 and have seen him several times since that initial evaluation.

Below is a copy of my initial evaluations, taken directly from the medical chart:

## History Of Present Situation:

46-year-old white man presenting for evaluation and management today for pathological gambling as well as generalized anxiety disorder.

The patient states that he has struggled with generalized anxieties throughout his adult life, primarily feelings of insecurity, fear of failure and negative thinking. Approximately 3 years ago, patient was running a fairly successful hedge fund management business and then began to gamble at a large-stake home poker game. Over the next several years, he continued to gamble compulsively as well as lost a lot of money of his investors to the point where eventually, in the early spring of this year, he was brought up on charges of wire fraud, embezzlement and securities irregularities. Essentially, at this point, the patient has stated that he has lost well over 5 million dollars

Exhibit 23

gambling in these poker games and over 25 million dollars of losses related to investment funds.

He has been living at the Beit T'Shuvah Residential Treatment Program for the last 2 months where he has been receiving individual and group therapy related to both gambling addiction as well as dealing with his anxiety and recovery.

At this point, he comes to clinic today to seek out and establish treatment here for the purposes of any need for psychiatric medications as well as to have a gambling treatment expert working with him for relapse prevention.

From a psychiatric standpoint now, he states that he is feeling stable in terms of mood, generalized levels of anxiety and functioning. He denies any physical or neurovegetative symptoms presently. He states that he has no urges to gamble, but that he also has no access to money and because he is living in a structured facility, much of his time is accounted for.

From a legal standpoint, he has been arraigned and is facing a presentencing hearing which will occur on July 20, 2009.

**Past Medical History:**
No active medical problems.

**Past Psychiatric History:**

1. Carries a probable diagnosis of generalized anxiety disorder.
2. He has had some individual therapies throughout his adult life, but very few psychiatric medication trials.
No hospitalizations.
No suicide attempts.

**Family Psychiatric History:**
Significant for a history of generalized anxiety as well as addictive disorders throughout his mother's and father's sides.

**Current Medications:** None.

**Allergies:** No known drug allergies.

**Social History:** Born and raised here in L.A. Finished college. During his 20s and 30s worked as an investment banker in several large firms, earned well over 6 figures for a majority of that time. In 2003 he went out on his own to start his own business, an

Exhibit 23

investment hedge fund. Now living in Beit T'Shuvah. All his assets have been frozen. He is not married. No kids.

**Substance Abuse History:** No history of illicit drug abuse or dependence. Does not smoke. Does not drink. No history of alcohol abuse or dependence.

**Gambling History:** Began gambling as a preteen, primarily cards as well as other games of chance for money. Throughout his adult life maintained that he was a social gambler, primarily at casinos, poker and various sports betting. His gambling did not take a turn to addiction and compulsion until approximately 2006 when he began playing more frequently in a home poker game. He describes his home poker game as being a network of 20 high-finance and high-profile individuals whom he was playing large-stakes poker with. As the losses mounted, he reported feeling more desperate and preoccupied with gambling. He was also chasing his losses and unable to stop. He describes that throughout this time period that the only form of gambling he had trouble controlling was the home poker. He did not do on-line poker on a regular basis and only occasionally would go to Las Vegas and gamble there, but did not incur any harmful consequences from casino gambling. Currently, he is going to GA twice a week at 2 separate groups. He does have a sponsor whom he works with.

**Mental Status Examination:** He is alert, awake and oriented x3. He is calm. He is cooperative. He is directable. He is linear and goal directed. He is articulate. His mood is stable. There is some generalized anxiety. For the most part pretty calm, cooperative. No SI or HI. Cognition appears to be intact.

**Impression:**

Axis I:

1.   Pathological Gambling
2.   Generalized Anxiety Disorder vs. Adjustment Disorder with Anxiety

Axis II:  Deferred

Axis III: None.

Axis IV: Large financial losses and pending legal problems.

Axis V: Global assessment of functioning approximately around 68.

Exhibit 23
3

265

Discussion: Patient is presenting with a history of lifetime gambling and generalized anxiety disorder coupled with an approximately 3-year history of pathological gambling behaviors. Now he is living in a structured residential treatment program and is facing fairly severe federal sentencing due to crimes related to his hedge fund investing. From a psychiatric standpoint, he appears to be relatively stable and is engaged and motivated with psychotherapy treatment at Beit T'Shuvah. There does not appear to be any clear indication for psychiatric medications at the present time.

Plan is the following: 1. Continue regular monthly meetings with me to monitor his psychiatric condition and to deal with the sequelae of pathological gambling. 2. Continue residential treatment at Beit T'Shuvah. 3. I have ordered neuropsychological testing for the purposes of diagnosis as well as quantifying his current level of functioning as well as looking for the existence of any executive functioning difficulties.

Exhibit 23

*The following is taken from my second visit with Brad:*

Date of Service: Monday, September 21, 2009

Site Of Service: UCLA Impulse Control Disorders Clinic.

Length Of Visit: 30 minutes.

Reason For Visit: Psychotherapy related to pathological gambling.

I saw the patient today for 35 minutes. He stated that he continues to be living at Beit T'Shuvah Residential Treatment Program. He has been, now, 5 months there. His sentencing date in federal court is December 2009. Overall, he describes his state of mind as stable and healthy. Denied any psychiatric symptoms such as depression, anxiety, or mood instability. He also states that he has not gambled nor are there any urges to gamble. From a financial standpoint, his assets remain frozen by the federal government. He does have access to credit cards and has been living in at Beit T'Shuvah the charity of his parents as well as the facility. He denies any health problems. He states that he is getting a lot out of the Beit T'Shuvah program in terms of understanding his development and the cues and pathways that led him to these pathological behaviors.

Current Medications: None.

Examination: On exam, he is linear, pleasant, cooperative, euthymic, directable. No SI or HI are noted. Neuropsychological testing results were reviewed today with him that were conducted by our UCLA Neuropsychology Service.

Impression:

1. Pathological gambling.

2. Cognitive disorder, not otherwise specified.

3. History of probable generalized anxiety disorder.

Plan Is The Following: 1. Strongly recommend ongoing care at Beit T'Shuvah 2. There are no indications for psychiatric medications at the present time. 3. Encourage

Exhibit 23

him to continue to pursue GA, as he is already doing outside of Beit T'Shuvah as well as document and record his effort level at GA. 4. Return to my clinic for monitoring and oversight in 4-6 weeks. 5. I have given him copies of his neuropsych report as requested

Exhibit 23
6

## Recommendations for Ongoing Treatment

Mr. Ruderman meets diagnostic criteria for pathological gambling.   Pathological gambling is a psychiatric disorder characterized by continued gambling despite ongoing adverse consequences.  Pathological gambling has biological, psychological and social roots and is a treatable condition.   One of the core symptoms includes committing illegal acts to support ongoing gambling activities.  Nearly 25% of pathological gamblers commit criminal acts during the course of their illness.   It is important to note that prior to the development of a gambling problem, Mr. Ruderman did not have a repeated history of criminal behavior.  This is a common feature among pathological gamblers.

Based on his statements, the severity of his gambling problem is quite high and is not likely to remit spontaneously.   The fact that he has not gambled, nor has he had any urges to gamble since being arrested is a good prognostic sign.

Mr. Ruderman states that he is highly motivated for treatment at the present time.  I would **strongly** recommend that he receive ongoing psychiatric treatment for pathological gambling and his anxiety disorder.

He is currently benefiting from individual psychotherapy that addresses his impulsivity helps him develop a stronger sense of self and coping mechanisms.   Individual psychotherapy has also helped improve his insight in regards to his past behaviors and to understand what motivated them.  Secondly, group psychotherapy, namely Gamblers Anonymous has  helped him gain control of his gambling urges while providing peer support.

Since his treatment at Beit T'Shuvah commenced, Brad has made tremendous progress.   He has been fully compliant with all treatment recommendations and has made improvements in all areas of his psychiatric conditions.

It is my opinion that incarceration for an extended period of time would prevent Mr. Ruderman from receiving the ongoing psychiatric care that he is currently getting. This, in turn, would increase the likelihood of relapse to gambling as well as the likelihood of a return of psychiatric symptoms.   The longer Brad stays at Beit T'Shuvah the more he will continue to improve and be stable.   I also believe that Brad has the ability to share his story openly and with others, which can be used to provide tremendous value to the community for prevention and education.

Exhibit 23